STATE EX REL. W. E. BYERLEY and Theodore G. Nelson, Petitioners v. THE STATE BOARD OF CANVASSERS, Thomas Hall, Secretary of State, William Langer, Attorney General, John Steen, State Treasurer, Carl H. Kositzky, State Auditor, and N. C. Macdonald, Superintendent of Public Instruction, Respondents.

(172 N. W. 80.)

**States — suit in name of state — rights of taxpayers and electors.**

1. Where an application is made for the prerogative writ of this court upon the relation of private individuals as taxpayers and electors, without first securing the consent of the attorney general or his refusal to maintain the action in behalf of the state, and its interests, and where the matter concerns only the state, its sovereignty, its franchises, or prerogatives, or the liberties of its people, no right of the relators or of any citizen of the state being immediately threatened with invasion or abrogation, this court will refuse to take jurisdiction.

**Constitutional law — legislative power — initiative amendment of Constitution.**

2. A proceeding for the amendment of the Constitution initiated by the

people, in the exercise of their sovereign power under the provisions of the initiative and referendum (article 16) is the exercise of a political power, legislative in its character, and the agencies and instrumentalities designated for securing the expression of the sovereign will exercise a political function.

**Constitutional law — initiative constitutional amendment — canvass.**

3. The State Board of Canvassers in determining and certifying to the vote of the people given upon a proposed amendment to the Constitution initiated by the people under the provisions of the initiative and referendum (article 16) exercises a political function legislative in its character.

**Constitutional law — initiative constitutional amendment — canvass of returns — political power.**

4. Where the State Board of Canvassers have not refused to canvass the returns upon an initiated proposed amendment to the Constitution, and where it is sought to exercise the judicial power to compel such board to canvass such returns in a particular manner upon the ground that their action taken is unwarranted in law, this court has no jurisdiction to interfere, the action of such board being political in its character.

**Courts — rules of decision — stare decisis.**

5. Where the legislative expression and enactment and the judicial construction had concerning the meaning of a particular phrase, "a majority of all the legal votes cast," has been consistently followed and adopted in this state ever since statehood, and has been repeatedly followed by decisions of this court, thus establishing a rule of construction affecting personal and property rights, the rule of *stare decisis* obtains.

**Elections — "vote" — "votes cast."**

6. *Held*, following State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360, and other cases:

(a) That a "vote" is the registration in accordance with law of the preference or choice of an elector on a given subject.

(b) That "votes cast" are the totals of the separate votes or expressions of voters' preferences for or against a proposed amendment to the Constitution.

**Constitutional law — initiative amendment — majority of all legal votes cast at general election.**

7. *Held*, following State ex rel. McCue v. Blaisdell, supra, and other cases, that the phrase, "a majority of all the legal votes cast at such general election," contained in subdivision 2 of article 16 of the amendment to the Constitution, means a majority of the votes cast upon the particular amendment submitted to the electors.

**Constitutional law — initiative amendment — certificate of state board of canvassers — correctness.**

8. *Held*, further following State ex rel. McCue v. Blaisdell, supra, and other cases, that the determination and certificate of the State Board of Canvassers,

stating that the amendments initiated by the people and submitted to the electors at the last general election in November, 1918, were adopted by having received, each of them, an affirmative vote equal to a majority of the votes cast on each amendment respectively, was proper, and correct.

Opinion filed January 31, 1919.

Application for and original writ of certiorari.

Denied.

*W. H. Stutsman,* for relators.

"A majority of all the legal votes cast means a majority of all votes whether they voted for the amendments or not." Const. subd. 2, § 202; State v. Babcock (Neb.) 22 N. W. 372; State v. Anderson, 42 N. W. 421; Tecumseh Nat. Bank v. Saunders (Neb.) 71 N. W. 779.

It does not mean a majority of those voting on the question to be submitted, but a majority of all the legal voters of the county. People ex rel. Davenport v. Brown, 11 Ill. 479; People v. Wiant, 48 Ill. 263; Chestnutwood v. Hood, 68 Ill. 132; 15 Cyc. 390; State ex rel. v. Foraker, 46 Ohio St. 677, 6 L.R.A. 422, 23 N. E. 491; Re Denny, 156 Ind. 104, 51 L.R.A. 722, 59 N. E. 359; State v. Lancaster, 9 Neb. 474; State v. Swift, 69 Ind. 505; Enyart v. Trustees, 25 Ohio St. 618; State v. Bechel (Neb.) 34 N. W. 342.

*William Langer,* Attorney General, *Edw. B. Cos,* Assistant Attorney General, and *Albert E. Sheets, Jr.,* Assistant Attorney General, for respondents.

"If the meaning of such provision is clear and unambiguous, legislative construction thereof is entitled to no weight; but if the meaning is doubtful, a practical construction thereof by the legislature will be followed by the courts if it can be done without using violence to the fair meaning of the words used in order to sustain the constitutionality of a statute." 8 Cyc. 737; State v. Blaisdell, 18 N. D. 31.

"The general policy of the American people is to test the sufficiency of any vote by vote on a particular question; and not by a vote on some other question." State v. Langley, 5 N. D. 594.

"A majority of all votes cast means all the votes cast for or against that particular proposition." V. T. Loan & T. Co. v. Whitehead, 2 N. D. 82, 49 N. W. 318; State v. Moorhouse, 5 N. D. 406, 67 N. W. 140; Hanson v. Deering, 7 N. D. 288, 75 N. W. 249; Law-

rence Co. v. Mead Co. 6 S. D. 528, 62 N. W. 131; United States v. Sanders, 22 Wall. 492; Oakland v. County, 118 Cal. 160, 50 Pac. 227; State v. Smilie, 65 Kan. 240, 69 Pac. 199; Gillispie v. Palmer, 20 Wis. 544; State v. Barnes, 3 N. D. 319, 55 N. W. 883; State v. Langley, 5 N. D. 594, 32 L.R.A. 723, 67 N. W. 958; State v. Porter, 11 N. D. 309, 91 N. W. 944; State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360.

When a constitutional provision is taken by one state from the Constitution of another, the interpretations which have been placed thereon are also taken with it. Jasper v. Hasen, 4 N. D. 1, 58 N. W. 454, 23 L.R.A. 58; Stafford v. Company, 2 N. D. 6, 48 N. W. 434; Peo v. Ritchie, 12 Utah, 193, 42 Pac. 209; White v. Chicago R. Co. 5 N. D. 308, 41 N. W. 730; Bank v. Gutterson, 15 S. D. 486, 90 N. W. 144; Cass Co. v. Imp. Co. 7 N. D. 528, 75 N. W. 755.

BIRDZELL, J.: Subdivision 2 of § 202 of the Constitution of North Dakota provides for amending the Constitution by the process known as the initiative. At the last general election certain amendments, for which petitions had been previously circulated, were referred to the electors of the state in accordance with the provisions of this section. At the election some of the amendments, though receiving a clear majority of all the votes cast for and against them, did not receive the affirmative votes of a majority of all the electors participating at the general election. The Board of Canvassers, acting under the authority of § 1025, Comp. Laws 1913, canvassed the votes cast and determined the result by certifying the number of votes cast for and against each amendment separately, and, by the majority of the board, by certifying that the amendments had been carried and adopted by the voters. The relators in this action apply for a writ of certiorari directed to the defendants, the Board of Canvassers, requiring the certification of the record to this court, to the end that we may review its action in making the determination above referred to, and, if the court should be so advised, vacate and annul the proceedings claimed to be in excess of the jurisdiction of the board. The petitioners, two in number, allege that they are citizens and taxpayers of the state, that they are beneficially interested in this proceeding and in the relief demanded. No facts are alleged, however, showing any in-

44 N. D.—9.

terest in them that is not common to every other citizen and taxpayer in the state. Upon the filing of the petition an order to show cause was issued, directing the defendants to show cause why the writ of certiorari should not issue as prayed for, the question of jurisdiction being expressly reserved. Upon the return day the attorney general appeared on behalf of the respondents and moved to dismiss the proceeding for lack of jurisdiction. A return was also made and the issues raised by both the motion and the return were presented in order that the court might determine such questions in relation to the matter as, upon consideration, it might deem to be properly before it.

Under the provisions of § 202 of the Constitution, amendments proposed by initiative petition are required to be referred to the people at the succeeding general election, and it is provided that: "should any such amendment or amendments proposed by initiative petition and submitted to the people receive a majority of all the legal votes cast at such general election, such amendment or amendments shall be referred to the next legislative assembly; and should such proposed amendment or amendments be agreed upon by a majority of all the members elected to each house, such amendment or amendments shall become a part of the Constitution of this state." Further provision is made for a second reference to the people at the succeeding general election if the amendment or amendments do not receive the approval of the legislative assembly. In the instant case we are not concerned with the sufficiency of the original petitions, nor is any question raised involving the proceedings had prior to the certification by the canvassing board. In a prior proceeding in this court it was held to be the duty of the secretary of state to submit the proposed amendments to the people at the last election. (State ex rel. Twichell v. Hall, File No. 3647, post, 459, 171 N. W. 213). We are now asked to interfere in the midst of the proceedings looking toward the ultimate amendment of the Constitution, for the purpose of determining the legality of one of the intermediate steps. In the case of State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281 (the capital removal case), this court held that it had ample jurisdiction to intercept a proposed amendment to the Constitution at its initial stage, on the ground of the nonexistence of a law authorizing the filing of a petition and the submission of the proposition; and in the case of State ex rel.

Baker v. Hanna, 31 N. D. 570, 154 N. W. 704, it was held that the court could properly exercise its original jurisdiction to determine whether or not a valid referendum petition had been filed against existing legislation, which, if filed, would have had the effect of suspending the operation of the particular law. In the former of these two cases it will be noted that jurisdiction was entertained for the purpose of preventing a ministerial officer from taking a step that was conceived to be wholly without warrant of law, and in the second case it was entertained to compel compliance with an existing law as to which, it was contended, no valid proceedings suspending the law had been had. These cases are not authority for the proposition that the court should interfere at the instance of the citizen wherever it is thought that, in the process of amending, a step has been taken which is not in strict conformity with the requirements of the Constitution. The exercise of jurisdiction upon a ground as broad as this would be subversive of the American constitutional theory of government through co-ordinate branches.

It is not contended that the court would have authority to interfere with the process of legislation as such. In fact, it is conceded that a legislative body, whether of the state or of a minor municipality, must be left free to make its own mistakes and that it cannot be judicially interfered with during the process. With the advent of the initiative and referendum, situations frequently arise where the principle of noninterference would seem to be applicable by analogy to the action of the voters. The conclusion that it is so applicable, however, is hardly warranted in the light of the inherent nature of our government. In a democratic republic the law is exalted. It is above the individual and it is above the office holder, however important his office may be. In order to vindicate its mandates it is sometimes necessary to resort to compulsion and restraint through judicial processes directed to those occupying responsible executive positions—even to the governor himself. If, in matters concerning direct legislation, the analogy of the relations between the judiciary and the legislative assembly be strictly and logically followed, it would result that every ministerial officer intrusted with a power necessary to facilitate the operation of the plan would be as free from judicial interference as would be the speaker or the chief clerk of the house of representatives or

the lieutenant governor as presiding officer of the senate in the performance of their respective functions. But we are of the opinion that this analogy cannot be followed to such an extreme. It would result in absurdity. It would exalt the executive officer rather than the law which determines his ministerial duties. The legislative assembly exercises a degree of control over its officers that it is impossible for the people to exercise over the ministerial officers whose participation in matters of direct legislation is essential to its orderly operation. By virtue of the inherent difficulty of exercising such a degree of control over ministerial officers as will facilitate the operation of the initiative and referendum and render it free from the whim or caprice of a designated officer, a court cannot be thought to be trenching upon the legislative power when it interferes merely for such limited purposes. To a limited extent this is also true as applied to the exercise of a restraining power during the initial stages in the interest of securing a legal ballot and a free, untrammeled election.

In commenting upon the result of the Colorado and South Dakota decisions (People ex rel. O'Reilly v. Mills, 30 Colo. 262, 70 Pac. 322, and State ex rel. Cranmer v. Thorson, 9 S. D. 149, 33 L.R.A. 582, 68 N. W. 202), Dodd, in his excellent work on the Revision and Amendment of State Constitutions, at page 232, says: "The courts have no power to interrupt the process of amendment before it is complete, to restrain a popular vote upon a constitutional proposal, even though they may be clearly of the opinion that the popular vote will be ineffective because of defects already apparent in the method of proposal. They must wait until the amending process is fully completed, and then pass upon the validity of the amendment if this question is properly presented in litigation before them. In accordance with this view it would seem that the courts should compel by mandamus administrative acts incident to the amending process; that is, the administrative acts should be treated as duties commanded by the Constitution after the legislative proposal, which may be regarded as presumably valid, and not subject to review in an ex parte proceeding. Under this view the courts may neither restrain the submission nor decline to compel it, because either of these is a direct interference with legislative action, the one positive in absolutely preventing submission, the other negative in that it does not enforce a purely minis-

terial duty in aid of the amending process." According to this view, the amending process is not to be frustrated, but is to be aided, where necessary, by compelling the performance of ministerial duties by those over whom the great body of legislators have no other means of control. It would seem that the basic principle of noninterference with the affairs of a co-ordinate branch of the government is sometimes best observed in the case of the initiative and referendum by a resort to the apparent anomaly of judicial compulsion as applied to the acts of ministerial agents.

The contention of the petitioners, however, is directly contrary to the principle suggested. They claim the right to intercept the proceedings in their midst, and this, though they show no interest that is not common to every other individual. The judicial department of the government is bound to assume that the legislative department would act with the same conscientious regard for the Constitution that actuates it.

It is said that, while engaged in a consideration of constitutional amendments, the legislature is not acting in a legislative capacity and that judicial interference with this function does not infringe upon any other department of the government. It matters little whether or not participation in the amending process is considered to be legislative in its character. Identical considerations apply, nevertheless. Jameson, in his work on constitutional conventions, a work which is devoted largely to the thesis that constitutional conventions are creatures of the power which creates them, takes the position that a convention is bound to observe whatever limitations may be prescribed by the act which authorizes the calling of the convention. Jameson, §§ 307–313. Dodd, on the other hand, takes the position that the constitutional convention, once assembled, is independent of exterior control and that it has the power to propose anything but (probably) to conclude nothing. Dodd, Revision & Amendment of State Constitutions, pages 80 to 117. While Jameson's view seems to minimize the authority of the created agency, it necessarily involves the proposition that the process is essentially legislative, in that it restricts it within bounds set by the legislature. While, if the view held by Dodd be considered correct, it is still unimportant whether the process be considered legislative; for, according to this view,

the agency is independent of other departments of the government, even of the legislature, and constitutes a sort of a fourth branch of the government. See Dodd, Revision & Amendment of State Constitutions, p. 80; Constitutional Conventions, by Roger Sherman Hoar, pp. 89, 160; 29 Harvard L. Rev. 520; and Carton v. Secretary of State, 151 Mich. 337, 115 N. W. 429. In Carton v. Secretary of State, supra, at page 340, it is said: "The convention is an independent and sovereign body whose sole power and duties are to prepare and submit to the people a revision of the Constitution or a new Constitution to take the place of the old one. . . . The Constitution clearly leaves this convention free from and untrammeled by any other department of government."

It was said by the judiciary committee of the constitutional convention of New York of 1894, of which committee Elihu Root was chairman, in a report denying the right of the courts, through prohibition, to interfere with a proceeding to determine the election of a member: "A constitutional convention is a legislative body of the highest order. It proceeds by legislative methods. Its acts are legislative acts." See Rev. Records N. Y. Constitutional Convention 1894, vol. 1, page 245, and at page 250 of the same records, it is said by the same committee: "It is of the greatest importance that a body chosen by the people of this state to revise the organic law of the state, should be as free from interference from the several departments of government, as the legislative, executive and judiciary are, from interference by each other." See also Sproule v. Fredericks, 69 Miss. 898, 11 So. 472, and for an authority expressing a contrary view, Wells v. Bain, 75 Pa. 39, 15 Am. Rep. 563. Also Woods's Appeal, 75 Pa. 59. Hoar, in his recent work, after presenting the foregoing authorities, has the following to say (page 91): "Thus the weight of authority is to the effect that the convention, when in session, is a fourth branch of the government, with the same immunity from interference as that possessed by the other three. The executive and judiciary have no more right to interfere with the fourth branch than they do with the other legislative branch, namely, the legislature. The legislature has no right to interfere with a legislative body of higher standing." While the foregoing discussion relates primarily to the powers of constitutional conventions, it concerns itself nevertheless with the lega.

character and status of the subject-matter with which the convention deals, namely the highest written law of the state in process of formation. The nature of this subject-matter is obviously the same whether created by a convention or by an amending agency. We refer to this matter here, merely as characterizing the nature of the function rather than as embodying considerations which would necessarily be controlling in any judicial proceedings ultimately brought to determine what provisions are legally incorporated in the Constitution. As was recently said by this court in the case of State ex rel. Fargo v. Wetz, 40 N. D. 299, 5 A.L.R. 731, 168 N. W. 846: "It is the duty of the court to uphold and give effect to every part of the Constitution, and this provision can only be enforced by refusing to recognize as an amendment that which was never legally adopted as such." We are clearly of the opinion that, regardless of the particular governmental character of the acts, as a result of which Constitutions are formed, submitted, or amended, both sound policy and the weight of authority concur in holding that the process is one to be carried on generally without any restraining judicial interference.

In the instant case, we are asked to review the action of a board of canvassers before the result of the various steps in the amending process can be known. It would doubtless be conceded that the canvassers cannot legally give official sanction to a vote received by merely declaring it to be legal or to have a given effect. There are further steps to be taken by constitutional officials whose action might make wholly unnecessary any resort to judicial proceedings. In legal contemplation, the petitioners present a situation that is in every way analogous to an application for certiorari, where an appeal from the action complained of is both simple and expeditious. The legislature is clearly free to act upon every consideration which, in the mind of the petitioners, vitiates the certificate of the canvassing board. It is elementary that certiorari is not a proceeding to be resorted to where there are other speedy and adequate remedies (Comp. Laws 1913, § 8445), and it is the duty of the courts to assume that legislative action will conform to the Constitution. It is also elementary that the issuance of the writ is largely discretionary, and should not be resorted to where complications of a public nature might follow its use. 6 Cyc. 748; 11 C. J. 130. This proceeding is clearly distinguishable

from the proceeding in People v. Stevenson, 281 Ill. 17, 117 N. E. 747. In that case the supreme court, at the instance of a states' attorney who petitioned on behalf of the people, issued a writ of certiorari and reviewed the action of the canvassing board which had declared a proposed amendment adopted and to have become a part of the Constitution. The proceedings, however, were not begun until after every step had been taken to incorporate the amendment into the Constitution. The action having been brought on behalf of the people and the amending process having been completed, it was, of course, proper for the court to review the proceedings for the purpose of determining the effect of the vote as certified to.

A situation somewhat analogous to the present case was recently presented in the district court of the United States, in the southern district of Ohio, in the case of State ex rel. Erkenbrecher v. Cox, 257 Fed. 334. An attempt was there made to enjoin the governor of Ohio from submitting to the legislature for ratification or rejection the proposed amendment to the Federal Constitution (which has since been adopted) prohibiting the manufacture, sale, or importation of intoxicating liquors within the United States and all territory subject to its jurisdiction. The suit was, like this one, a taxpayer's suit. In an opinion filed on the 4th day of this month (January), Judge Hollister held that the plaintiff showed no interest which entitled him to maintain the action, and, furthermore, that the court was powerless to take any action that could result in preventing the legislature from performing its own functions in connection with the proposed amendment. In the opinion it is said:

"It is not open to doubt that every member recently elected to the General Assembly knows of the existence of the proposed amendment, and everyone knows that the subject is of such interest in the state of Ohio, as well as elsewhere, that there are members of the General Assembly about to sit who will see to it that the subject is brought to the attention of the General Assembly. . . . Whatever injury, if any, may result by the consideration by the General Assembly of the proposed amendment, will follow whether the governor acts or not. The governor's threatened act cannot of itself do plaintiff any injury of any kind, and therefore the suit will not lie against him. . . . It cannot be assumed in advance that the

General Assembly of Ohio will take any action violative of the Constitution of the United States. Moreover, if the two houses of the General Assembly should take a vote on the subject, one cannot say in advance what the result would be. The proposed amendment may be rejected because the members of the General Assembly may think the proceedings at Washington were not in consonance with the Constitution, or because of insufficient votes in the affirmative. Indeed, the General Assembly may take no action at all. . . .

"Moreover, if the plaintiff is injured, that injury does not arise until the proposed amendment is adopted by the respective legislatures of three fourths of the states. . . .

"The judicial department of the government . . . cannot interfere with the preliminary proceedings of either the executive department or the legislative department with respect to matters committed by the Constitution to their charge. So far as this court is aware, judicial action has never been taken, or even thought of, against any step of the legislative department leading up to the enactment of a law, however subversive of the Constitution. It is only after proceedings are taken to enforce the unconstitutional law that the courts are called upon to act at all; indeed, the question whether the courts had any power in such case was not settled until sometime after the adoption of the Constitution. . . .

"It may be plaintiff has no adequate remedy, or any remedy, at law; but it does not necessarily result that for that reason alone he is entitled to an injunction. Plaintiff says his rights are injured by the failure of the houses of Congress, in passing the resolution, to observe the requirements of the Constitution, and, since he has suffered a wrong there must be a remedy. His conclusion is good, but his premise is bad. His right does not arise, and the wrong is not suffered, until the legislatures of three fourths of the states have voted to adopt the amendment. Then will be the time for him to show, if he can, that the resolution of the two houses of Congress was no resolution at all, and the action of the states thereon a futili[t]

"For this reason also this suit cannot be maintained. . . .

"Moreover, plaintiff's rights do not arise, and no wrong is
to him, until the attempt to delegate the reserved power is a

apparently consummated and something is done in the exercise of the power. . . .

"No present constitutional right is involved in this behalf, and the same may be said, once for all, of every alleged deprivation of constitutional rights in this case. . . .

"By the decision of this case against him, the plaintiff loses no constitutional right, and there is no Federal question alleged."

We are of the opinion that, so far as jurisdiction is concerned, there is no substantial difference between an application for injunction to prevent a canvassing board from certifying the result on the ground of a false showing and a proceeding in certiorari in which it is sought to change the effect of the certification for the same reason while the amendatory proceedings are pending and incomplete. The rights alleged to be threatened are the same, and the suitor has the same recourse to an appropriate co-ordinate branch. Conceding that that portion of the certificate of the canvassing board in the instant case which purports to determine the result is void, because based upon either a false determination of the requisite number of votes or because of an erroneous conception of the legal effect of the election, it does not follow that all injurious consequences may not be obviated by the body in which the Constitution vests the power of approval or rejection. Nor is it conceivable that that body could be prevented by anything that might be done in this proceeding from performing what it perceives to be its constitutional functions.

There is a sense, however, in which the opinion of the legislature, in regard to its constitutional functions, is not a finality. The judiciary is required to determine the law applicable to any given controversy and to apply it, and its judgment as to whether or not a legislative act is valid must ultimately be the controlling one. Being of the opinion that the courts cannot properly intercept a constitutional amendment which has been voted upon by the people, while it is in process of being submitted to the legislature, we could not, with propriety, determine the matter in such a way as to interfere th legislative action on the subject. The opinion of the court upon question during the pendency of legislation would amount to no than an advisory opinion, for the guidance of the other depart- Under the Constitution, we are not authorized to perform such

a function. A proposal to vest such a power in the supreme court was expressly repudiated in the constitutional convention. Debates, Constitutional Convention 1889, pages 231, and 251 to 275. Furthermore, it may be observed that the experience of those courts, upon whom the duty of rendering advisory opinions has been expressly enjoined by the Constitution, has been of the character that does not commend the practice beyond the strict limits of the duty imposed. See correspondence passing between Governor Dineen of Illinois and the judges of the supreme court for a complete discussion of this matter, 243 Ill. 9.

For the foregoing reasons, we are satisfied that, at the time the order to show cause was issued, this court could not properly exercise its original jurisdiction, nor, indeed, could any court have properly exercised jurisdiction to determine the legality of the steps in the amending process which had been taken prior to the time the application was made. It may be stated here too, that, in connection with the application, the petitioners asked for a temporary restraining order, but the court considered that it would be improvident to grant such a request and counsel did not press the application. Since the proceedings were instituted, however, and in fact very soon after the arguments were held, it is common knowledge, and hence within our judicial cognizance, that the legislature proceeded to consider the amendments referred to and adopted them. In the light of these facts it is obvious that a decision of this court rendered at this time upon the additional question argued will tend in no way to influence either the legislative or the executive branches of the government in the exercise of what they conceive to be their constitutional functions concerning the amendments. One of the chief reasons, therefore, for the nonexercise of jurisdiction by this court no longer exists, and we conceive it to be proper at this time to express our views upon the other question presented. There is no longer any question of delicacy due to appropriate deference to and respect for the co-ordinate branches of the government and we feel that it is no longer necessary to refrai from discussing such reasons as there may be for the refusal to iss the writ. The matter has been fully argued and upon such a ments it appears to the court that there is an additional and c sive reason why the writ should not issue.

As an original question, the writer of this opinion confesses to a considerable degree of doubt as to whether or not paragraph 2 of § 202 of the Constitution could be properly construed to require only a majority of the votes cast upon a given initiated proposal, and were the question presented now for the first time, it would seen to him that the language employed with reference to the number of votes is indicative of a legislative intention to differentiate in this respect between amendments initiated by petition and amendments proposed by the legislative assembly under the first paragraph of the section, where it is explicitly provided that amendments of the latter sort are ratified by a majority of the electors voting thereon. In view of the fact, however, that other provisions of the Constitution which are substantially identical with the language of the second paragraph of § 202 had, long prior to the adoption of the latter paragraph, received a construction at the hands of this court which would seem to give to it a clear legal signification and meaning, we are not at liberty to examine the question as an original one. The legislature is responsible for the language found in this paragraph. It has stated that such amendments require a "majority of all the legal votes cast at such general election." If it used this expression in the light of the judicial definition previously placed on such an expression by this court, the court should be very reluctant to redefine the expression so as to deprive it of the meaning previously given. This consideration is of especial importance in this case by reason of the fact that the legislature now sitting has apparently adopted the previous interpretations of this court and has held the amendments to have received a sufficient vote. A brief reference to the prior decisions and to the constitutional setting of substanially the same language will indicate to what extent the meaning adopted by the legislature is warranted.

In the first case, that of State ex rel. Larabee v. Barnes, 3 N. D. 319, 55 N. W. 883, this court had occasion to determine whether or not the article of the Constitution prohibiting the manufacture and sale of intoxicating liquors was adopted. Section 8 of the Enabling provided for elections to be held in the territories to which the act applicable, at which the voters should vote directly for or against proposed Constitutions and for or against any articles or prop- separately submitted, and it was provided that "*if a majority*

*of the legal votes cast* shall be for the Constitution, the governor shall certify the result to the President of the United States, together with a statement of the votes cast thereon, and upon separate articles or propositions." Though the Enabling Act further provided (§ 24) that the constitutional convention might provide for the election of officers for the state governments, and though the constitutional convention, in the schedule adopted, did provide for the election of officers at the same election as that at which the Constitution was adopted (§ 12 of the schedule), this court held that the expression "majority of the legal votes cast," as used in the Enabling Act, meant "votes cast for or against the adoption of the Constitution or the articles separately submitted." While Congress did not require all the elections to be conducted at the same time, it nevertheless required that there should be separate votes upon the Constitution and upon different articles that might be submitted, of which prohibition was one, and anticipated that officers might be elected at the same time.

It seems that the constitutional convention placed a similar construction upon the Enabling Act. In § 20 of the schedule it was expressly provided that "if a majority of all the votes cast at said election for or against prohibition are for prohibition, then said article 20 shall be and form a part of this Constitution and be in full force and effect as such from the date of the admission of this state into the union, but if a majority of said votes shall appear according to said returns to be against prohibition, then said article 20 shall be null and void and shall not be a part of this Constitution."

In the case of State ex rel. Little v. Langlie, 5 N. D. 594, 32 L.R.A. 723, 67 N. W. 958, this court had occasion to construe a statutory provision governing an election to determine the relocation of a county seat wherein it was provided that if "any one place has two thirds of the votes polled" such place shall be the county seat. The statute in question required the question of the relocation of the county seat to be submitted at a general election and it was held that the expression "votes polled" meant the vote polled upon the particular question.

Again, in the case of State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360, this court construed the following language contained in § 168 of the Constitution: "All changes in the boundaries of organized counties before taking effect shall be submitted to the elec-

tors of the county or counties to be affected thereby at a *general election* and be adopted by a *majority of all the legal votes cast* in each county *at such election."* After an exhaustive discussion of the question presented in that case, this court, unanimously, speaking through Mr. Justice Spalding, held that the case of State ex rel. Little v. Lang-lie, was directly in point, and that the foregoing language meant a majority of the votes cast upon the particular question. In that opinion the court referred to the lack of uniformity in various parts of the Constitution wherein provision is made for voting upon particular questions and accounted for it by the fact that in the constitutional convention different committees had jurisdiction over different subjects. However, in the article of which § 168 is a part we find two other sections, §§ 170 and 171, in which reference is made to matters in relation to county government to be voted upon by the people. In § 170 it is made the duty of the legislature to provide for county government through township organization "whenever a *majority of all legal voters of such county, voting at a general election, shall so determine,"* and it is further provided that "the management of the fiscal concerns of said county by the board of county commissioners may be dispensed with by a *majority vote of the people voting at any general election."* In the next section it is provided that in any county which may have adopted a system of government by chairmen of township boards, "the question of continuing the same may be submitted to the electors of such county at a general election in such a manner as may be provided by law, and *if a majority of all the votes cast* upon *such question* shall be against said system of government, then such system shall cease, etc." Thus, in the very article in which the language construed in the Blaisdell Case, supra, was employed, and in connection with the very subject of county government, we find language which clearly and *expressly limits* the majority of the votes *to the particular question,* as in § 171; whereas in the third section preceding it this court held that it was so limited by *implication,* the limiting expression not being there used. So far as any argument may be drawn in the instant case from proximity of context, it would also be equally applicable to the question as presented in the Blaisdell Case.

The case of State ex rel. McCue v. Blaisdell, supra, has been referred to with approval in State ex rel. Davis v. Willis, 19 N. D. 209--225,.

124 N. W. 706; in State ex rel. Miller v. Flaherty, 23 N. D. 313, 321, 41 L.R.A.(N.S.) 132, 136 N. W. 76, and in State ex rel. Minehan v. Thompson, 24 N. D. 273, 139 N. W. 960.

It would be futile to attempt to add to the reasons previously assigned by this court for the construction given to the language referred to. All that need be said now is that we can conceive of no distinction between the expression "majority of all the votes cast at such general election" as found in paragraph 2 of § 202 of the Constitution, and the expression "majority of all the legal votes cast in each county at such election," as found in § 168 of the Constitution, it being clear that the election referred to in § 168 is a general election at which the question is authorized to be submitted. There being no satisfactory distinction to be drawn between the two expressions referred to and the language having been repeatedly interpreted by this court before it was employed in § 202 of the Constitution, we do not feel at liberty to change the well established legal construction. See 12 C. J. 706. This is a substantive, and to our minds an altogether conclusive, reason for the denial of the writ.

For the foregoing reasons the writ is denied without costs.

GRACE, J., concurs.

BRONSON, J. This is an original application to this court for the issuance of a writ of certiorari to the State Canvassing Board for the purpose of reviewing the action and the determination of such board in certifying the adoption of several amendments to the state Constitution proposed by initiative petitions, by the vote given at the general election held on November 5, 1918. Pursuant to the order to show cause issued therefor, the attorney general, in behalf of such board, has filed a motion to quash these proceedings, challenging the jurisdiction of this court and the cause of action of the relators, and an answer and return setting forth the proceedings of such board and alleging that the same were due and regular as provided by law.

The admitted facts necessary for an understanding of this proceeding are as follows: At the general election held on November 5, 1918, there were submitted to the voters five proposed amendments to the state Constitution known respectively as the taxation, debt limit, Con-

stitutional amendments, emergency measures and public ownership proposals. These were so submitted under initiative petitions proposed by the people under the provisions of the Gibbens Amendment to the state Constitution, known as article 16 of the Amendments, subdivision 2. At such election these proposed amendments received, respectively, majorities of those voting on such proposals, ranging from 12,000 to 14,000, but less than a majority of all the voters who voted at such election. For instance, the public ownership proposed Amendment received 46,830 votes for and 32,574 votes against the same, a majority of 14,256 upon the question but 198 less than a majority of all the voters who voted, as found by such State Canvassing Board. Section 1025, Compiled Laws of 1913, concerning the canvassing of any proposed amendment to the Constitution provides that the state board shall ascertain and determine the result and shall certify under their hand a statement of the whole number of votes given for, and the whole number of votes given against, such amendment, and they shall thereupon determine whether such amendment has been approved and ratified by a majority of the legal electors voting thereon, and shall make and subscribe on such statement a certificate of such determination.

The said state board found, determined, and certified that each of such proposed amendments had been carried and adopted inasmuch as a majority of the voters voting on said proposed initiated amendment had voted in favor of the same. In this regard the Gibbens Amendment to the Constitution, under which the initiative petitions in question were submitted to a vote of the people, provides as follows: "Should any such amendment or amendments proposed by initiative petition and submitted to the people receive *a majority of all the legal votes cast at such election,* such amendment or amendments shall be referred to the next legislative assembly."

The relators maintain that this constitutional provision required a majority of all the legal voters who voted at such election. For instance that inasmuch as the board determined that there were 94,055 legal votes cast at such election, on the public ownership proposal, the constitutional provision required a vote of 47,028, in order that the same might carry, and that therefore the determination and certificate of the board so issued was improper and illegal.

The issues presented on these facts raised the following questions for the consideration of this court:

(1) The right of the relators to maintain this action.

(2) The power of this court to assume jurisdiction over the subject-matter at this time.

(3) The question of the due adoption by the people of the initiated proposed amendments.

This case involves a very important political proposition. Able briefs and able arguments have been presented by each of the counsels for the contending parties. Strenuously do the relators contend that it is the duty of this court as a sovereign branch of our state government to uphold the Constitution and to declare by judicial determination the illegality of the proceedings had by the state board, and with considerable insistence the relators further maintain that this court representing the judiciary branch of our government must firmly inhibit any attempt of the other branches of the government to transgress constitutional requirements.

This matter is before this court under unusual circumstances. The political question involved is being discussed on every side. Relators have set up in their brief before this court the contentions made by political organizations on the question involved. A legislative assembly, in the capitol where the court is now sitting, is in session. On the same day that arguments were being made before this court, in the legislative halls, these proposed amendments already were under consideration and were being approved by a branch of the legislative assembly. The very questions proposed to this court are being determined and passed upon by such legislative assembly in exercising its functions as part of our state government, as arguments pro and con by legislators resound throughout the halls. Obviously this court can be neither blind nor deaf as to these surrounding conditions. The application and order to show cause first presented to this court solicited a restraining order temporarily restraining the state board from certifying and referring such proposed amendments to the legislative assembly, pending this hearing, although relators' counsel did not insist upon such order. Grave questions are presented to this court concerning its jurisdiction to interfere at this time. Serious questions likewise are involved concerning the right or the power of this court by its

44 N. D.—10.

mandate, decree, or judgment herein, to interfere in any manner with the legislative assembly or with such state board reporting to it in the course of its action, or by its judicial determination, to indicate to such legislative assembly its duty or the manner in which it should act upon any matter now pending before it.

It is the sworn duty of this court to uphold the Constitution. It is equally the sworn duty of the legislative departments of our government to uphold the Constitution.

As stated by Justice Christianson in the opinion in State ex rel. Linde v. Taylor, 33 N. D. 84, L.R.A.1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583, wherein he quotes with approval the following:

" 'The legislative and judicial,' said Cooley (Cooley, Const. Lim. 7th ed. pp. 227, 228) 'are co-ordinate departments of the government, of equal dignity; each is alike supreme in the exercise of its proper functions, and cannot directly or indirectly, while acting within the limits of its authority, be subjected to the control or supervision of the other, without an unwarrantable assumption by that other of power which, by the Constitution, is not conferred upon it. The Constitution apportions the powers of government, but it does not make any one of the three departments subordinate to another, when exercising the trust committed to it. The courts may declare legislative enactments unconstitutional and void in some cases, but not because the judicial power is superior in degree or dignity to the legislative. Being required to declare what the law is in the cases which come before them, they must enforce the Constitution as the paramount law, whenever a legislative enactment comes in conflict with it.

" 'But courts sit not to review or revise the legislative action, but to enforce the legislative will.' " See State ex rel. Standard Oil Co. v. Blaisdell, 22 N. D. 86, 92, 132 N. W. 769, Ann. Cas. 1913E, 1089.

It is well settled that it is not the function of the courts to in any manner interfere with or inhibit legislative undertakings. To do so would be an invasion of the legislative functions apportioned to another department of government. The question always, therefore, is whether the proceeding involved is legislative in its character, or involves a matter occurring during the course of a legislative proceeding. It is important to premise the opinion of this court by these statements in order that the function of a court may be properly comprehended with

relation to the legislative department of our government, and further to the end that, in times of violent discussion and enactment of political questions involving proceedings of a legislative character, the court may not be made a shuttle cock for the purpose of securing an expression in a judicial way of the legal correctness of proceedings undertaken, the result of which will be either to warn or curb legislative matters then pending. The case therefore involves questions of the highest importance in the exercise of the judicial sovereign power. It has received the earnest and sincere attention of this court. The questions presented therefore all will be discussed even though this court by the decision of one of the points raised need not necessarily pass upon the others so presented.

The respondents contend that the relators have shown no legal right to maintain this action. In the application of the relators each of them state that he is a citizen and taxpayer of the state and that he is bene ficially interested in the subject-matter of the proceeding. No other ground of right or of interest is shown. No demand upon, or refusal of, the attorney general to institute or maintain this proceeding is alleged or shown. It does, however, appear that the attorney general is *ex officio* a member of such canvassing board and appears herein for the respondents. The relators seek the prerogative writ of certiorari in the exercise of the original jurisdiction of this court. To warrant the issuance of this original writ, it must appear either, that the relators have such a peculiar interest by reason of which their personal or property rights are being or are about to be infringed or abrogated or denied by the action complained of creating a special reason or peculiar emergency, or, that the subject-matter is *publici juris,* affecting the sovereignty of the state, its franchises, or prerogatives, or the liberties of its people, and involving in some way the general interests of the state at large. State ex rel. Walker v. McLean County, 11 N. D. 356, 92 N. W. 385; State ex rel. Madderson v. Nohle, 16 N. D. 168, 125 Am. St. Rep. 628, 112 N. W. 141; State ex rel. McArthur v. McLean, 35 N. D. 203, 213, 159 N. W. 847; State ex rel. Steel v. Fabrick, 17 N. D. 532, 538, 117 N. W. 860.

In State ex rel. Walker v. McLean County, supra, Judge Wallin, in the opinion of the court, stated: "Ordinarily a private person, who volunteers as a champion of only public rights, and as such invokes

the prerogative writs, will be regarded as an intermeddler. It appears by the information and more fully by the briefs of counsel in behalf of the relator, that the relator has suffered no wrongs peculiar to himself, but on the contrary the relator appears in this court as a champion of the state, and for the ostensible purpose of protecting governmental franchises from abuse."

Clearly therefore the right of the relators to maintain this proceeding must be founded upon the latter grounds above stated.

In State ex rel. Linde v. Taylor, 33 N. D. 76, 83, L.R.A.1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583, Judge Christianson, in the opinion of the court concerning this original jurisdiction, said:

"It is well settled that this jurisdiction will not be exercised to vindicate private or local rights regardless of their importance, but it is reserved for the use of the state itself when it appears to be necessary to vindicate or protect its prerogatives or franchises, or the liberties of its people." . . . While it is true that the relator in this case, in his capacity of a citizen and taxpayer of the state, has a sufficient interest to invoke this court's prerogative jurisdiction as a relator, still the real plaintiff is the state. The private relator, in his capacity as a citizen and taxpayer, merely informs the court of the infringement which has been or is about to be made upon the sovereignty of the state, or its franchises or prerogatives, or the liberties of its people, and the court by virtue of the power granted by the Constitution commands that the suit be brought by and for the state, even though the attorney general may refuse to bring this action or consent to its institution.

"This transcendent jurisdiction is a jurisdiction reserved for the use of the state itself when it appears to be necessary to vindicate or protect its prerogatives or franchises, or the liberties of its people; the state uses it to punish or prevent wrongs to itself or to the whole people; the state is always the plaintiff and the only plaintiff, whether the action be brought by the attorney general, or, against his consent, on the relation of a private individual under the permission and direction of the court." State ex rel. Bolens v. Frear, 148 Wis. 456, 500, L.R.A.1915B, 569, 134 N. W. 673, 135 N. W. 164, Ann. Cas. 1913A, 1147; State ex rel. Linde v. Taylor, 33 N. D. 84, L.R.A.1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583.

Under § 157, Compiled Laws 1913, it is the duty of the attorney general to appear for and represent the state before the supreme court in all matters in which the state is interested as a party.

Under § 3376, subd. 9, the attorney general and state's attorneys are the only public prosecutors, in all cases, civil and criminal, wherein the state, or county, is a party to the action.

It is therefore manifestly the proper practice in all cases where the exercise of the original jurisdiction of this court upon a prerogative writ is demanded, and where the state is the real plaintiff, to make the application by or through the consent of the attorney general, or, in the event of his refusal to act, to bring such fact to the attention of this court for its consideration in the allowance or granting of such writ.

The attorney general is the chief law officer of the state. Upon him is the duty imposed to appear for and represent the state in which the state is interested as the State.

Upon the refusal of the attorney general to institute the proceeding requested, the situation is as stated by Judge Bruce in the opinion of the court in State ex rel. McArthur v. McLean, 35 N. D. 212, 159 N. W. 847, wherein he said: "In the case at bar the attorney general of the state has expressed his willingness that the proceedings shall be brought, but has refused to bring them himself, as he considers that it is not a case in which his office should be concerned. The case, therefore, is similar to one in which an application has been made to the attorney general to institute the proceedings, but he has refused to do so, and where an application is made to this court by a private citizen to bring them. It is not, therefore, a case in which the state as a state is seeking to exercise its sovereign power and to assert its prerogative, but a case in which a private citizen and voter and a candidate for public office, who is more or less affected by the matter, seeks the protection of this court on the ground that the sovereign rights of the state or its franchises are after all the sovereign rights and franchises of all its citizens and that all of its citizens are interested in having the political and elective machinery of the state properly administered."

As stated in State v. Nelson County, 1 N. D. 101, 8 L.R.A. 283, 26 Am. St. Rep. 609, 45 N. W. 33, these prerogative writs are ordinarily issued upon motion of the attorney general; as chief law officer

of the state, upon whom the duty is imposed to represent and appear for the state when the state's interests are concerned, it is peculiarly proper that matters *publici juris,* affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people involving in some way the general interests of the state at large, and concerning which the prerogative writ of this court is sought, should be first addressed to his attention for his direct action or refusal to so act.

See State ex rel. Taylor v. Lord, 28 Or. 498, 31 L.R.A. 473, 43 Pac. 471.

It is true that the refusal of the attorney general to institute or to consent to the instituting of such proceeding does not prohibit this court from exercising its original jurisdiction in such cases, but it should be made to appear to this court, not only that the chief legal adviser of this state, and representing its interests, has been advised and has refused to institute the action for the state, but also that, nevertheless, under the facts presented, this court should take original cognizance of the subject-matter upon the relation of a private individual. State ex rel. Moore v. Archibald, 5 N. D. 359, 376, 66 N. W. 234; State ex rel. McArthur v. McLean, 35 N. D. 203, 159 N. W. 847; State ex rel. Twichell v. Hall, No. 3647, post, 459, 171 N. W. 213.

Furthermore, a very serious question is presented upon the proposition whether this court should take original jurisdiction of the subject-matter involved at this time upon the application as made by the relators therefor.

No right of the relators or of any citizen of the state, either personal or property, is immediately threatened with invasion or abrogation. Though the matter is affected with a great public interest and although it vitally concerns the fundamental law of this state, the sovereign powers of the state, its franchises or prerogatives, are not in any manner threatened with immediate infringement, whether the writ issue or not, unless it be premised that affirmative action will be taken by the legislative assembly to make such proposed amendments a part of the Constitution of this state.

To warrant the assertion of such original jurisdiction, the interests of the state, the threatened invasion of its franchises or its prerog-

atives, or of the rights and liberties of its people, should be both primary and proximate, not indirect and remote, thereby creating such a contingency which requires the interposition of this court to preserve and protect the same. State ex rel. Moore v. Archibald, supra.

This court does not sit as a monitor for either the legislative or executive branches of our government. It neither advises nor rebukes contemplated action of a co-ordinate branch of the government. Its power necessarily is not only persuasive but compelling. The exercise of original jurisdiction in this matter at this time must necessarily commend by judicial intervention the state board concerning their action on the proposed amendments. This necessarily means that this court must either commend, interrupt, or interfere with the action of the legislative assembly thereupon.

Liberally this court has exercised its original jurisdiction in the issuance of prerogative writs. It has been extended sufficiently far. It should now be recognized and established that this court will not exercise its original jurisdiction in matters of this kind, beyond the limits herein stated.

## 2. *Jurisdiction over the Subject Matter at This Time.*

Again, the serious attention of this court is addressed to its very jurisdiction at this time over the subject-matter and to the judicial action necessarily involved in the cognizance or consideration thereof. This, in part, has been mentioned heretofore in this opinion. The primary question with which we are confronted is to determine whether the initiation, submission, adoption and ratification of proposed amendments to the Constitution under the initiative power is fundamentally the exercise of a political or legislative power, or whether the acts of the agencies designated to accomplish such amendment are ministerial in their nature so as to present thereby a judicial question for the courts to review such acts during the course of the proceedings to accomplish such amendment.

It is well settled that the judicial power will not interfere in any action or proceeding which involves by such action or proceeding the exercise of a political or legislative action. The relators do not deny this general principle. They contend that the action of the state

board cannot be classed in any manner as legislative in its character. That it is ministerial and therefore subject to the review of this court.

The question presented is not easily determined and is not free from many difficulties in the construction of the powers of the judiciary in connection with and over the co-ordinate legislative and executive de· partments of our government in making a change in our fundamental law. The principal question involved also involves the corollary proposition of the right or power of the judiciary to interfere with any proceeding or action, made pursuant to statutory direction, and not contrary thereto, when the effect thereof is to establish a judicial admonition, advice or inhibition of contemplated action by the legislative assembly, a co-ordinate department of the government. If the initiation, submission and adoption of the proposed amendments concerned is from beginning to the end, from the time of the initiative petitions signed by the people to the time of ratification by the legislative assembly, an undertaking, through the exercise of the sovereignty of the people, in a legislative way to formulate the fundamental law of the state, or an amendment thereof, is legislative in its character, and the agencies designated by the sovereign power to accomplish such change or amendment of the fundamental law, are acting within and pursuant to a power conferred, it is clear that the judiciary has no power to interfere.

This broad principle is not only fundamental, but it must also be recognized as basically essential in the preservation of our tripartite theory of government and in the prevention of any judicial usurpation or interference in any legislative proceeding. 4 Federalist, p. 329; State ex rel. Taylor v. Lord, 28 Or. 498, 31 L.R.A. 482, 43 Pac. 471; Hawkins v. Governor, 1 Ark. 570, 33 Am. Dec. 346; State ex rel. Twichell v. Hall (No. 3647) post, 459, 171 N. W. 213; Ohio ex rel. Erkenbrecher v. Cox (U. S. D. C. Ohio, Jan. 4, 1919) 257 Fed. 334.

The relators, however, contend that the initiation and adoption of such proposed amendments is not in any sense a legislative act.

There is a noticeable lack of harmony or uniformity among the authorities and in decisions concerning what constitutes a proceeding legislative in its character so as to inhibit judicial interference. To some extent this lack of harmony can be explained by drawing a sharp

line of distinction between the exercise of the judicial power over an officer or agency which is attempting to proceed in a legislative matter without any power so to do and the exercise of such power, where the officer or agency is proceeding in a legislative matter, pursuant to a power conferred, whether properly or improperly. There is also a distinction to be drawn between the judicial authority compelling the performance of a plain duty or power imposed upon an officer or agency, in a matter legislative in its character, as an instrumentality in the progress of a fundamental legislative enactment to secure the expression of the sovereign will, and the judicial authority interfering with such duties, interpreting the same, and preventing in such legislative proceeding an expression of the sovereign will. The viewpoint involved is the right of the sovereign power acting through one of its co-ordinate and independent agencies, the legislative side, to secure an expression of the sovereign desire in such fundamental legislative matters without judicial direction, admonition, or interference. When the proceedings of such co-ordinate department actually trangresses the constitutional requirements and violates the prerogatives or franchises of the state, or infringes upon the rights and liberties of its people, or of the fundamental law of our United States, contrary to constitutional provisions, the courts will then interfere and set aside such legislative proceedings.

Thus, in State ex rel. Baker v. Hanna, 31 N. D. 570, 154 N. W. 704, a mandamus action against the State Board of Immigration, the question of the validity of legislative action already taken was involved. This depended upon whether there was in fact a sufficient petition filed with the secretary of state for a referendum of the law involved to the people. There being no sufficient petition filed, there was no power conferred to refer and the law was in force. It involved no interference with legislative action. The court passed upon legislative action already taken. It enforced the legislative will. State ex rel. Linde v. Taylor, 33 N. D. 85, L.R.A.1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583.

The relators contend and quote authorities to uphold the contention that the legislative assembly in acting upon or providing for the amendment of the Constitution is not exercising a legislative power,

and this likewise applies to actions or proceedings thereupon by state officials or by the people.

In our tripartite system of government where and what is the law-making power? Is the exercise of the lawmaking power a matter of legislative character? These questions must be answered and considered upon fundamental grounds, and not upon grounds of narrow construction or of narrow language. It is true that the legislative power is ofttimes meant the power of the legislature pursuant to constitutional delegation, to make, enact, and repeal laws. It is true that in speaking of this legislative power of such legislature it does not mean the power that such legislature has inherently or pursuant to constitutional mandate to initiate the process of amending the Constitution. It is further true that this legislative power so granted by the Constitution does not include a power to trespass upon the executive or judicial departments of the government. The term as thus used revolves around the specific right granted to legislatures to make, alter, and repeal laws.

Within these narrow definitional grounds many of the authorities quoted by the relators are in point.

It is a mere syllogism to state that the exercise of the lawmaking power is legislative in its character. The question still remains unanswered: Where and what is the lawmaking power? The power that creates or formulates a Constitution is lawmaking. The Constitution itself is a law, the fundamental law of our land. The power that changes or amends this fundamental law is lawmaking. This power to so amend or change either resides in the people or in the legislature, or both the people and the legislature. It does not reside in the executive or judicial departments.

In O'Laughlin v. Carlson, 30 N. D. 213, 221, 152 N. W. 675, Judge Christianson in the opinion of the court said, quoting from State ex rel. Standish v. Boucher, 3 N. D. 389, 395, 21 L.R.A. 539, 56 N. W. 142: "All governmental sovereign power is vested in the legislature, except such as is granted to the other departments of the government, or expressly withheld from the legislature by constitutional restrictions."

Relators' contention concerning this legislative power would lead to the conclusion that the exercise of this power by the people or the

legislature under article 15 of our amendment to the Constitution, known as the initiative and referendum as to legislation would be legislative in its character because it is simply an exercise of such legislative power, but when a proceeding is similarly had under article 16, the one involved herein to amend the fundamental law, it is not legislative. In either case plain reasoning upon fundamental grounds compels the conclusion that, in the very essence of the matter, the proceedings are legislative and upon broad grounds there appears no reason why the same rule of noninterference of the judiciary should not apply both to proceedings while in their course through the legislature or through the people under this exercise of the legislative power, as narrowly defined, and to proceedings through the legislature and to the people on matters concerning a change of the fundamental law.

Even in the case of Ellingham v. Dye, 178 Ind. 336, 99 N. E. 1, Ann. Cas. 1915, 200, quoted and relied upon by the relators, the court said, "The words 'legislative power' in a constitutional delegation of general legislative authority mean the power or authority under the constitution or frame of government to make, alter, and repeal laws and a 'state Constitution' has been aptly termed a legislative act by the people themselves in their sovereign capacity, and therefore the paramount law. . . . A 'Constitution' is legislation direct from the people acting in their sovereign capacity while a 'statute' is legislation from their representatives, subject to limitations prescribed by the superior authority."

In Ellingham v. Dye, supra, where a secretary of state was restrained from submitting to the voters of the state a proposed new Constitution proposed and approved by the legislative assembly, the court, in its majority opinion, by process of construction of the Constitution and the powers of the legislature thereunder expressly held and stated: "The grant to the General Assembly of "the legislative authority of the state" did not transfer from the people to the General Assembly all the legislative power inhering in the former. But as said in McCullough v. Brown, 41 S. C. 220, 23 L.R.A. 410, 19 S. E. 458, only "such legislative power as may be necessary or appropriate to the declared purpose of the people in framing their Constitution and conferring their powers upon the various departments constituted for the sole purpose of carrying into effect their declared purpose."

In that case the court held that the question was one of power to draft or submit a proposed new Constitution and that the assembly did not have this power, it possessing only that measure of power expressly granted to it by the people speaking through the Constitution and that such power so granted was to be exercised strictly in the mode provided, namely, either by the express provisions in the Constitution providing for the calling of a constitutional convention or by proposed amendments adopted by two successive assemblies.   The court also distinguishes the cases of State ex rel. Cranmer v. Thorson, 9 S. D. 149, 33 L.R.A. 582, 68 N. W. 202; Threadgill v. Cross, 26 Okla. 403, 138 Am. St. Rep. 964, 109 Pac. 558, and People ex rel. O'Reilly v. Mills, 30 Colo. 262, 70 Pac. 322, holding to a rule of nonjudicial interference, by stating that those states have different Constitutions.

But, in this state, this court has held and has adhered to the principle of constitutional construction that all governmental sovereign power is vested in the legislature, except such as is granted to the other departments of the government, or expressly withheld from the legislature by constitutional restrictions.   State ex rel. Standish v. Boucher, supra; O'Laughlin v. Carlson, 30 N. D. 213, 152 N. W. 675.

In fact, this court, in the case of State ex rel. Standish v. Boucher, supra, recognized a distinction between the constitutional provisions of this state and the state of Indiana, and the construction given to the powers of the legislative department under each, concerning the very principle of constitutional construction herein involved and above quoted.   In that case, this court said:   "State ex rel. Yancey v. Hyde, 121 Ind. 20, 22 N. E. 644, was another instance where the legislature created a state office, and named the incumbent, and empowered him to appoint certain other officers, and to fill vacancies.   A provision of the Indiana Constitution, after dividing governmental powers among the three departments, provided that 'no person charged with official duties under one of these departments, shall exercise any of the functions of another except as in this Constitution, expressly provided.'   Another provision empowered the governor to fill vacancies in state offices.   The court held—three judges against two—that the act of the legislature violated both of these constitutional provisions. A study of the majority opinion shows it to be grounded upon the fact

that there was no express authority conferred upon the legislature by the Constitution to fill such office.  The court says: 'Whatever may be said of the Constitutions of other states, it cannot be successfully maintained that, under the Constitution of this state, the legislature possesses latent or undefined power.'  If there be any reasoning in that case that does not meet our approval it is based upon a constitutional provision which we do not have.  The case of State ex rel. Worrell v. Peelle, 121 Ind. 495, 22 N. E. 654, is in its main feature identical with State ex rel. Yancey v. Hyde."·

In the case at bar, there is no question that the people have the *power* to initiate and vote upon proposed amendments to the Constitution.  There is no question that the legislative assembly has the *power* to ratify them.  The *power* must be and is conceded.  Relators' contention, in effect, therefore, is, not that the legislature does not have the *power,* but, is that the proposed initiated amendments having not been duly adopted by the people, the exercise or attempted exercise of such *power* by the legislature would be a useless act and the state board, in consequence should be subjected to the interference of the judiciary thereby enjoining the exercise or attempted exercise of such power by the legislature.

Furthermore a distinction can be drawn between the process of amending the fundamental law through the initiative of the people and the process of amendment initiated by the legislative assembly.

Even though the process of amending the Constitution through the initiation of the legislative assembly by concurrent resolutions agreed upon by two successive legislative assemblies has been deemed a proceeding where the legislature is acting as the agent of the sovereign power, rather than in its legislative capacity (as narrowly defined). Nevertheless, a different conception can readily be applied when the people themselves are proceeding in their sovereign power.

Section 2 of the Constitution provides: "All political power is inherent in the people.  Government is instituted for the protection, security, and benefit of the people, and they have a right to alter or reform the same whenever the public good may require."

It has heretofore been stated that the principle of governmental construction applies in this state that all governmental sovereign power is vested in the legislature, except that granted to the other depart-

ments, and except that expressly withheld from the legislature by constitutional restriction.

More and more the people in this state, possessing the political power, have been taking unto themselves the right to alter and reform their government instituted by and for them. They have enacted initiative and referendum provisions reserving and giving to the people, in the exercise of their political power, the right to initiate laws, the right to refer laws, the right to initiate amendments to the fundamental law and the right to refer the same to them for their approval or rejection. This is the highest exercise of a political power and is a power which the people inherently possess as a political power as well as a legislative power.

In acting under this broad power they are acting for and by themselves subject only to the restrictions that they themselves have placed upon the exercise of their power in their Constitution.

Under this conception it is readily observed that there is a broad line of demarcation between judicial interference with sovereign agencies of the people, in other departments of the government, in compelling them to perform a duty enjoined, or in restraining them in exercising a power conferred, and a judicial interference with this exercise of the sovereign power of the people themselves, acting in their own right and pursuant to a power expressly reserved to them.

In the exercise of this sovereign power by the people, they have appointed instrumentalities or agencies acting for the people in the exercise of this power in order to give an expression to the sovereign will. These instrumentalities and agencies are not acting as such as a ministerial agent of the executive department or as ministerial agent of the legislative department. It will be readily conceded that the legislative assembly when exercising its pure legislative power in the enactment of a law cannot be restrained by the judiciary, whether the law proposed be unconstitutional or clearly beyond the powers of the legislative assembly. It will further be readily conceded that the clerk of the house or the clerk of the senate or any member of either body will not be restrained by the judiciary in certifying a legislative enactment or presenting the same or in transmitting the same from one body to the other, whether the same is being presented or is about to be presented in an illegal or unconstitutional manner.

Thus in Smith v. Myers, 109 Ind. 1, 58 Am. Rep. 375, 9 N. E. 692, it was held that the court had no jurisdiction to enjoin a secretary of state from transmitting certified returns to the house of representatives as required by the Constitution and statute of Indiana.

So in People ex rel. Sutherland v. Governor, 29 Mich. 320, 18 Am. Rep. 93, the court said: "On the other hand it would be readily conceded that no court can compel the legislature to make or to refrain from making laws, or to meet or adjourn at its command, or to take any action whatsoever, though the duty to take it be made ever so clear by the Constitution or the laws. In these cases the exemption of the one department from the control of the other is not only implied in the frame work of government, but is indispensably necessary if any useful apportionment of power is to exist."

Likewise in Frantz v. Autry, 18 Okla. 561, 91 Pac. 193, it was held that the court had no power to restrain the constitutional convention, its officers or delegates, from exercising any of the rights, powers, and obligations entitled to it by Congress or the people.

Accordingly, in the case at bar the question is not the question of the power of the State Canvassing Board, but of the manner in which it is exercising such power.

Under this general conception of the nature of this proceeding, there can be no question that the judiciary as such has no power to interfere until such time when the proceedings had become a judicial question by directly interfering with the rights of the people or the rights of the state under constitutional provisions. Under initiative and referendum provisions, this conception of the power of the judiciary should obtain in order, not only that a judiciary may retain its proper place as an arbiter of judicial questions and not political question, and further in order that the sovereign rights of the people, while being expressed or seeking expression in a legislative undertaking, may not be subjected to a government by injunction through the courts, advising, directing, or admonishing the expression of the sovereign will by the people.

That under such view point the judiciary should not interfere is well and amply sustained by the authorities. State ex rel. Cranmer v. Thorson, 9 S. D. 49, 33 L.R.A. 582, 68 N. W. 202; People ex rel. O'Reilly v. Mills, 30 Colo. 262, 70 Pac. 322; Speer v. People, 52 Colo.

325, 122 Pac. 768; Duggan v. Emporia, 84 Kan. 428, 114 Pac. 235, Ann. Cas. 1912A, 719; State ex rel. Rose v. Superior Ct. 105 Wis. 651, 48 L.R.A. 819, 81 N. W. 1046; Mauran v. Smith, 8 R. I. 192, 5 Am. Rep. 564; State ex rel. Bullard v. Osborn, 16 Ariz. 247, 143 Pac. 117; Allen v. State, 14 Ariz. 458, 44 L.R.A.(N.S.) 468, 472, 130 Pac. 1114; People ex rel. Sutherland v. Governor, 29 Mich. 320, 18 Am. Rep. 89; State ex rel. Taylor v. Lord, 28 Or. 498, 31 L.R.A. 473, 43 Pac. 471; State ex rel. Oliver v. Warmoth, 22 La. Ann. 1, 2 Am. Rep. 712; Frantz v. Autry, 18 Okla. 561, 91 Pac. 193; Mississippi v. Johnson, 4 Wall. 475, 498, 18 L. ed. 437, 441; People ex rel. Billings v. Bissell, 19 Ill. 229, 68 Am. Dec. 591; Dallas v. Dallas Consol. Street R. Co. 105 Tex. 337, 148 S. W. 292; Pfeifer v. Graves, 88 Ohio St. 473, 104 N. E. 533; note in 50 L.R.A.(N.S.) 215 et seq.; Cress v. Estes, 43 Okla. 213, 142 Pac. 411.

In the case of Orman v. People, 18 Colo. App. 302, 71 Pac. 430, it was held that the State Board of Canvassers in canvassing the election returns for the election of representatives to the general assembly were discharging duties political and governmental in their character, and that the court had no power to compel them to act in a particular manner, the said board having not refused to act.

In the case of Dallas v. Dallas Consol. Street R. Co. 105 Tex. 337, 148 S. W. 292, it was said that the court had no power to enjoin a canvassing board from canvassing the election returns on a proposed ordinance for the reason that such board was exercising a political power in so doing.

In the case of Grant v. Hardage, 106 Ark. 506, 153 S. W. 826, it was held that the court had no jurisdiction to restrain the speaker of the house of representatives from declaring that a constitutional amendment had been adopted.

In the case of Frost v. Thomas, 26 Colo. 222, 77 Am. St. Rep. 259, 56 Pac. 899, the court held that it had no power to compel the governor to refrain from putting in force a law for the reason that it was claimed to be unconstitutional, because the governor was performing an executive duty, a function governmental in its nature, with which the judiciary could not interfere.

So, again, in the case of Smith v. Myers, supra, the court held that it was without jurisdiction to restrain the secretary of state from

certifying election returns of the votes cast for lieutenant governor to the house of representatives.

In the case at bar the state canvassing board in performing its duties in connection with the canvassing of the election returns upon the proposed constitutional amendments are performing a political function, legislative in its character; they are performing a function in the exact manner which the statute has required it to do. The board has not refused to act; the complaint is made that it did not act in the proper manner.

It might well happen that the legislative assembly would require or command such board to certify the canvass made by them in the manner that it was made, and thereupon there would be presented the question of the judiciary and the legislative branch of a government exercising its authority over this board; from the views expressed herein it is clear that this court has no jurisdiction to compel or direct such state board concerning the manner in which it shall canvass and certify the election returns upon the amendments in question.

### 3. The Question of the Due Adoption of the Initiated Proposed Amendments.

Although the primary jurisdictional questions, hereinbefore considered, are sufficient to deny the application of the relators, there is still another valid and potent reason why this court should not exercise its original jurisdiction to grant its prerogative writ herein to control or direct the action of the State Board of Canvassers.

It is considered now wholly proper to consider every point raised by the relators herein contending for the issuance of the prerogative writ of this court. There are no plain and evident reasons why this court should consider every point presented upon the record herein which legally justify this court in refusing to issue its prerogative writ. It is now no secret and this court may take judicial notice (Comp. Laws 1913, § 7983, subd. 59), that the legislative assembly, during the pendency of this cause, have received, passed upon, and adopted the proposed initiated amendments herein; Now, on their face, these proposed amendments are a part of the constitution of this state. This court is not now in an advisory position to the legislature. Its

44 N. D.—11.

action herein will not now in any manner interfere with, direct, or control, by its judicial decree, the legislative proceedings upon such amendments, already had. The judicial question presented and now to be considered can be passed upon by this court without any judicial interference with or admonition to the legislative branch of the government:

This question concerns the interpretation to be placed upon the language used in subdivision 2 of the 16th (Gibbens) Amendment for the adoption or approval of initiated proposed amendments by the people at a general election, requiring them to *"receive a majority of all the legal votes cast at such general election."*

The question is: Whether such amendment must each receive an affirmative vote equal to a majority of the electors who were present and voted at such general election; or,

An affirmative vote equal to a majority of the electors who voted on the amendment in question.

In the legislative assembly of 1911 the amendment in question, the Gibbens Amendment, was introduced and adopted in the form of a concurrent resolution amending article 15 of our original Constitution as it had existed since statehood. Chap. 89, Laws of 1911.

At the same session of such assembly there were also introduced and adopted a concurrent resolution known as the Plain Amendment (Chap. 86, Laws of 1911), providing for an initiative and referendum by the people, amending said article 15 and article 2 of the Constitution and requiring on constitutional measures, by the people, a majority of all votes cast thereon, and on legislative matters, a majority of votes cast thereon, also another concurrent resolution, known as the Doyle & Ployhar Amendment (Laws 1911, chap. 94) likewise providing for an initiative and referendum and amending said article 15 and article 2 of the Constitution, requiring on constitutional measures, by the people, a majority of electors voting thereon, and, on legislative matters, a majority of votes cast thereon, and also a concurrent resolution, known as the Bessessen Amendment (Laws 1911, chap. 93) providing for an initiative and referendum on legislative matters and amending said article 2 of the Constitution, § 25, and requiring an approval by the people on matters submitted thereunder of a majority of votes severally cast for and against the

proposition. In the legislative assembly of 1913 all of these amend
ments were again introduced, but only two of them, the said Gibbens
and Bessessen Amendments were adopted.   At the general election
held in 1914, these proposed amendments were submitted to the
people for approval and ratification and were adopted by large ma-
jorities, the Bessessen Amendment now known as art. 15 of the amend-
ments receiving 48,783 votes for and 19,964 against, and the Gib-
bens Amendment, receiving 43,111 votes for and 21,815 against.   This
Gibbens Amendment has now been before this court for the third time
for interpretation and construction.   In 1916 in State ex rel. Linde v.
Hall, 35 N. D. 34, 159 N. W. 281 (the New Rockford Case), this
court, held that the provisions of such amendment concerning the
submitting of initiative petitions thereunder to the people were not
self-executing and restrained the secretary of state from submitting
an initiative petition filed thereunder for the removal of the state
capitol.   In 1918, in State ex rel. Twichell v. Hall, No. 3647, post,
459, 171 N. W. 213; reversed the holding in the New Rockford Case,
held that said Gibbens Amendment was self-executing in its provisions
and refused to restrain the secretary of state from submitting the
initiative petitions filed for the submission of the proposed amend-
ments to the Constitution that are involved herein and which the re-
lators now claim were not duly adopted by the vote of the people at the
last general election held.

It is now interesting to observe our Enabling Act, the constitutional
provisions as variously stated therein concerning the specific ques-
tion herein involved, the judicial construction thereon consistently
followed since statehood, and the legislative enactments and legislative
policy likewise followed and adopted since statehood.

In the Enabling Act, passed by Congress and approved Feb. 22d
1889, providing for constitutional conventions and the manner of the
submission of the proposed Constitutions to the people of the territory
of Dakota out of which arose the states of North Dakota and South
Dakota, it was provided in § 8 thereof that the proposed Constitution
formulated by the constitutional convention for the territory, now
the state, of North Dakota should be submitted for ratification or re-
jection by the qualified voters at an election to be held on the first
Tuesday in October, 1889: That at such election the qualified voters

should vote directly for or against the proposed Constitution, and for or against any articles or propositions separately submitted; and further that "the returns of said election shall be made to the secretary of each of said territories, who, with the governor and chief justice thereof, or any two of them, shall canvass the same and if *a majority of the legal votes cast* shall be for the Constitution, the governor shall certify the result to the President of the United States, together with a statement of the votes cast thereon and upon separate articles or propositions." In section 9 thereof it was further provided that representatives to the 51st Congress and the governor and other officers provided for in such proposed Constitution might be elected on the day of such election.

At such election in October, 1889, the proposed Constitution now the original Constitution of the state consisting of 20 articles was submitted to the voters; also the election of the governor and other state officials. The body of such Constitution, 19 articles, was submitted as one proposition and article 20 thereof, the prohibition clause was submitted as a separate proposition. At such election the vote cast for the body of the Constitution was 27,441 for and 8,107 against; for the prohibition clause 18,552 for and 17,393 against. The total vote cast for governor was 38,098. A certificate of the result of such vote upon the proposed Constitution was made by the governor as required by said Enabling Act to the President of the United States, and pursuant thereto, President Harrison on Nov. 2d, 1889, issued a proclamation admitting this state into the Union wherein he stated in part as follows.

"Whereas it has been certified to me by the governor of the territory of Dakota that within the time prescribed by said act of Congress a Constitution for the proposed state of North Dakota has been adopted and the same ratified by a majority of the qualified voters of said proposed state in accordance with the condition prescribed in said act;

"And whereas it is also certified to me by the said governor that at the same time that the body of said Constitution was submitted to a vote of the people, a separate article, numbered 20 entitled 'Prohibition' was also submitted and received a majority of all the votes cast for and against said article as well as a majority of all the votes

cast for and against the Constitution and was adopted." [26 Stat. at L. 1549.]

In State ex rel. Larabee v. Barnes, 3 N. D. 319, 55 N. W. 883, the relator informed against for violation of such prohibition clause and the statutory enactments made pursuant thereto, sought relief through a writ of habeas corpus in this court, claiming that such prohibition clause was null and void for the reason that it had not been adopted by the majority required under the terms of such Enabling Act since such prohibition clause received only 18,552 votes therefor, or less than a majority of the total votes cast for governor at such election which were 38,098 votes.

Concerning this contention the court said:

"Upon these facts it is urged upon us with great earnestness and force that a 'majority of the votes cast' within the meaning of said § 8 of the Enabling Act, were not in favor of the adoption of said article 20, and hence the same was never adopted. This proposition cannot receive our assent and we will briefly state some of the reasons which irresistibly lead our minds to the opposite conclusion. Said § 8 of the Enabling Act requires (and the requirement is mandatory) that the proposed Constitution, and any specified article that the constitutional convention may direct, be submitted to a vote of the people, and that any such specific article shall be voted upon separately, and that, if a majority of the votes cast be in favor of the Constitution that fact shall be certified to the President of the United States, with a statement of the votes for and against the Constitution and each specific proposition so separately submitted, together with a copy of the Constitution and of any articles separately submitted; and from the data thus certified the President was required to determine whether or not the Constitution was republican in form and whether or not all the requirements of the Enabling Act had been complied with, and, if so, he was required to issue his proclamation admitting North Dakota as a state. Where, in this section, Congress spoke of the votes cast, it had reference to votes cast upon the particular objects which it directed should be submitted to a vote of the qualified electors. Congress had no knowledge that any candidate for offices would be voted for at that same election, and the matter of electing officers was left under the exclusive control of the constitutional convention; and, fur-

ther, it was the vote upon the Constitution and the articles, if any, separately submitted, that was to be certified to the President; and if by the use of the words 'majority of legal votes cast' Congress meant votes cast upon any subject other than those directed to be certified to the President, it would be obviously impossible for that official ever to determine whether or not the Constitution had been legally adopted, and yet under the act, the duty devolved upon him to determine that question at once.     These considerations seem to us to conclusively establish that when Congress used the words 'majority of legal votes cast' it meant votes cast for or against the adoption of the Constitution or of the articles separately submitted.    Whether or not Congress did not also intend that, in case the Constitution was adopted, the separate articles should stand or fall upon their separate vote, we need not determine."

The relators place the construction upon this case that the decision was based upon the grounds that Congress had no knowledge that state officers would also be voted on at this election, that it was the vote upon the Constitution and articles that was required to be certified to the President, and that if Congress had intended differently it would have been impossible ever to determine whether the Constitution had been legally determined, and furthermore that, if this court had at that time conceived the law to be that a majority of all the votes cast at a general election meant merely a majority of those cast for or against a particular measure, it could easily have said so.    This contention is answered when it is observed that Congress specifically provided in such Enabling Act that state officers might be elected at the same election as well as representatives to Congress.    Furthermore, in this same act, § 5 thereof, Congress provided that at the election of delegates for the constitutional convention, held in May, 1889, there should be submitted the proposition of the "Sioux Falls Constitution" for approval or rejection by the voters and for the determination thereof by a majority of the votes on such question; and, if the same was approved, for the later submission of the same again by such convention to the voters along with other questions, articles, and propositions and for the determination of the result by a majority of the votes cast on the ratification or rejection of such Constitution.    It therefore appears that Congress used language in such act providing in some case for

approval of matters to be submitted to the voters by a majority of votes cast on the proposition and in other case for a majority of the legal votes cast. Nevertheless the interpretation of the territorial Canvassing Board, of the Federal government, and of this court was favorable for the due adoption of the prohibition clause by a majority vote cast on the proposition. Even though this court in State v. Barnes did not specifically determine the meaning of the words "majority of the legal votes cast" aside from the terms of the Enabling Act, its holding is significant in view of the later decisions of this court upon the question.

See also schedule, § 20, N. D. Const.

In our Constitution and in our statutory legislation, anterior to, and concurrent with, the introduction, passage, and adoption of the Gibbens Amendment, expression has been given in various forms to the manner in which a determination may be had of the approval or rejection of measures or propositions submitted to the people.

A few of these may be quoted for purposes of illustration.

In art. 5 § 122 of the Constitution, concerning the elective franchise, it is provided: But no law extending or restricting the right of suffrage shall be in force until adopted by *a majority of the electors of the state voting at a general election."*

In art. 4, § 111, in the Constitution, relating to county courts, it is provided that the jurisdiction of said court may be increased whenever the voters of a county with the requisite population shall so decide *by a majority vote.*

In art. 10 § 168, of the Constitution, relating to county and township organization, the provision is: "All changes in the boundaries of original counties before taking effect shall be submitted to the electors of the county or counties to be affected thereby at a general election and be adopted by a *majority of all the legal votes cast in each county at such election."*

In § 170 of said art. 10, it is provided: "The legislative assembly shall provide by general law for township organization under which any county may organize, whenever a *majority of all the legal voters of such county voting at a general election* shall so determine, and whenever any county shall adopt township organization, so much of this Constitution as provides for the management of the fiscal concerns

of said county by the board of county commissioners, may be dispensed with by *a majority vote of the people voting at any general election.*"

In § 171 of said art. 10, it is further provided: "In any county that shall have adopted a system of government by the chairmen of the several township boards, the question of continuing the same may be submitted to the electors of such county at a general election in such a manner as may be provided by law, and if a *majority of all the votes cast upon such question* shall be against said system of government, then such system shall cease in said county, and the affairs of said county shall then be transacted by a board of county commissioners as is now provided by the laws of the territory of Dakota."

In § 202 of art. 15 of the original Constitution, providing for future amendments of the Constitution by the adoption of a proposed amendment by two successive legislative assemblies, it is provided for the submission of the same to the people thereupon as follows: "Then it shall be the duty of the legislative assembly to submit such proposed amendment or amendments to the people *in such manner* and *at such time* as the legislative assembly shall provide: and if the people shall approve and ratify such amendment or amendments by *a majority of the electors qualified to vote for members of the legislative assembly voting thereon,* such amendment or amendments shall become a part of the Constitution of this state."

Under § 565 of the Compiled Laws of Dakota Territory for 1887, which pursuant to schedule § 2 of our Constitution became in force in this state when it became a state, it was provided with reference to the removal of county seats: "Whenever the inhabitants of any county are desirous of changing the place of their county seat, and upon petitions being presented to the county commissioners, signed by two thirds of the qualified voters of the county, it shall be the duty of the said board, in the notices for the next general election, to notify said voters to designate upon their ballots, at said election, the place of their choice; and, if, upon canvassing the votes so given, it shall appear that any one place *has two thirds of the votes polled,* such place shall be the county seat."

Under § 1883, Revised Codes 1895, the question of the removal of a county seat was determined at a general election by *"two thirds or more of all the legal votes cast by those voting on the proposition."*

Under § 1886, said Rev. Codes 1895, it was further provided that when such election had been held and at least *two thirds of the votes are not cast* for some other place than that fixed by law as the former county seat, no second election for the removal thereof must be held within four years thereafter, and further under §§ 1887 et seq., when a county seat has been once removed, it could be removed again at a general election when *two thirds of all the votes cast* are in favor of some other location.

In 1915, the legislative assembly amended said § 1883 but not the method of determination, the same still remaining *"two thirds or more of all the legal votes cast by those voting on the proposition"* (Laws 1915, chap. 116). It did amend however, in this respect, said § 1886 by providing as follows: "When an election has been held and at least *two thirds of the votes cast at such election are not cast* for some other place than that fixed by law as the former county seat, no second election for the removal thereof must be held within four years thereafter." (Laws 1915, chap. 117). Again in 1917 the legislative assembly again amended said chap. 117, Laws 1915, but retained the same language concerning the method of determination by vote of the people. Laws 1917, chap. 102.

Attention may also be called to § 4278, Compiled Laws 1913, enacted in 1897, providing for the dissolution of townships by a *majority of all the legal voters in such civil township.* To § 1190, Compiled Laws 1913, last enacted in 1913, providing for a consolidated school by *a majority of votes cast at such election.* To § 4043, Comp. Laws 1913, providing for the increase of the limitation of municipal indebtedness by a *vote of the electors of such municipality* at an election held for that purpose. To § 4015, Compiled Laws 1913, providing for the authorization of municipal bonds *by a majority vote of the qualified electors of such city or municipal corporation voting thereon at an election called regularly for that purpose.* To § 3773, Compiled Laws 1913, last enacted in 1911, providing for the adoption of the commission form of government for cities by a *majority of the votes cast at such election.*

From the constitutional and statutory provisions quoted, it is readily observed that there has been a noticeable lack of uniformity in the

phraseology used to express a method of determining the approval or rejection of propositions submitted to the people.

It is also to be noticed that in the Constitution including the Bessessen Amendment, art. 15, and the Gibben Amendment, art. 16, eight different phrases have been used to express a method of determination of the vote of the people. It is also particularly noteworthy to observe that the phrase *"majority of all legal votes cast"* has been used three times in the Constitution, to wit, in the Gibbens Amendment twice and in § 168 of the Constitution once, and also in the Enabling Act, excepting that the word "all" is not used in Enabling Act phrase. It also is to be observed that when the legislative assembly in 1915, used the phrase *"two thirds or more of all the legal votes cast by those voting on the proposition,"* in chap. 116, Laws 1915, it meant the same as the expression or phrase *"two thirds of the votes cast at such election"* contained in chap. 117, Laws 1915, for both refer to a general election and both refer to the same subject-matter, to wit, the vote necessary to remove a county seat; otherwise these phrases would be inconsistent.

With these premises a consideration may now be had of the holdings and policy of construction followed by this court and other courts upon this phrase "majority of all legal votes cast," and the meaning of the same in the Gibbens Amendment.

In State ex rel. Little v. Langlie, 5 N. D. 594, 32 L.R.A. 723, 67 N. W. 958, this court said: "The general policy of the American people is to test the sufficiency of any vote by the vote on the particular question, and not by the vote on some other question. Unless the language is free from doubt we have no right to spell out of the statute by a far fetched inference, a purpose to depart from this general policy."

As otherwise stated, in State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360: "Where there is submitted to a vote of the electors of a given county or other district, a special question, whether so submitted at a general or special election, a majority of the votes cast upon that question only will be sufficient to carry the question or adopt the proposition, unless the legislative will to the contrary is clearly expressed in the law or the Constitution, as the case may be."

Relators have devoted a large part of their brief in explaining, con-

struing, in part contending against and disagreeing with the case of State ex rel. McCue v. Blaisdell, supra. They even urge this court to overrule the principles of law announced in that case upon the subject-matter involved.

The opinion in this case was written by former Chief Justice Spalding, who was a member of the constitutional convention. It is a well-considered and able opinion. It followed and is consonant with the principles of construction applied on this subject-matter by the earlier cases of State ex rel. Larabee v. Barnes, 3 N. D. 319, 55 N. W. 883, and State ex rel. Little v. Langlie, supra. It has not since been overruled. In the case of State ex rel. Minehan v. Thompson, 24 N. D. 273, 314, 139 N. W. 960, the bar of this state were assured that this court then considered such case as an authority. Upon its principles of construction the prohibition clause in our Constitution from statehood has been upheld and a rule of personal and property rights thereunder followed. Likewise upon its principles of construction have the location of county seats and the boundaries of counties been determined. The principles of law announced in this case in placing a construction upon the meaning of *"a majority of all the legal votes cast"* are clear, explicit, consonant with this court's other decisions and the expressed legislative policy and supported by the clear weight of authority upon the meaning of such particular phrase.

In this case of State ex rel. McCue v. Blaisdell, an application was made to this court for an original writ of certiorari. It appeared that in the general election of 1908 several propositions were submitted to the electors of Ward county for the division and creation of new counties therein. At such election none of the propositions received a majority of the votes cast thereon excepting the proposition for the creation of Mountraill county which received 4,207 votes for and 4,024 against. At that election the various candidates for governor received an aggregate vote of 9,259 votes. The sole question presented for determination was the construction to be placed upon the phrase *"a majority of all the legal cast"* contained in § 168, art. 10, of the Constitution, hereinbefore mentioned, relating to the vote necessary to accomplish a change in the boundaries of counties. The relator contended that such section properly construed, required an affirmative vote equal to a majority of the total votes cast for the different candi-

dates for governor, and the respondent contended that such provision required only a majority of the votes cast upon the proposition.   To arrive at a determination of the question the court proceeded to define or interpret the meaning of the words, "elector," "voter," "votes cast" and "ballot."   In this respect the court said:  "We deem it advisable to first consider and determine the meaning of certain words contained in the constitutional provision quoted, stripped of meaningless words, as applied to the present controversy and to simplify matters, we may read that portion of § 168 quoted as follows: all changes in the boundaries of organized counties shall be submitted to the electors at a general election and be adopted by a majority of the votes cast at such election.   The word 'electors' may be used to apply to different classes or bodies of people.   It is sometimes applied to all persons who are qualified to vote within their respective political subdivisions.   At other times it is used as synonymous with 'voters' and in many instances has been used indiscriminately and interchangeably with the word 'voters.'   But its meaning in the section in question is not left in doubt, because it is defined by the Constitution itself [quoting § 121, Const. as amended].   We next come to the interpretation of the words 'votes cast,' and to aid us in this we may seek the definition of the word 'voter.'   This word, like the word 'elector' is used in various senses, but when used in apposition to or in contrast with, the word 'elector' it has but one meaning.   A voter in this sense is an elector who exercises the privilege, conferred upon him by the Constitution and the laws, of voting.   He is an elector who does vote, and in the present instance, a voter is one who voted at the last November general election, and on the question in controversy is one who actually voted, either for or against the creation of the new county. . . .   An elector is not a voter unless he votes, yet he still retains his qualifications as an elector.   The word 'vote' used as a noun is the expression of the choice or preference of the voter.   The choice may be exercised in several different manners; *viva voce,* by the use of a ballot; by show of hands; by a division of the house or meeting, and possibly by other methods."

The court further said:

"A ballot, as distinguished from a vote in the legal sense, and in a general way, is the piece of paper upon which the voter expresses his

choice. Under the Australian system, for the reasons above enumerated and many others, the voter is permitted to express his choice or vote upon any offices, and perhaps many questions on the same ballot. It is but an application of the same principle that prevailed when the choice of the voters was expressed *viva voce* or by any of the old methods. In other words notwithstanding he may use but one ballot, the voter casts as many separate votes or expresses his choice as many times, as there are candidates or questions for or against which he votes. To illustrate: He casts a vote for presidential electors, another vote for governor, another vote for member of Congress, and so on through the list of offices to be filled or questions to be voted upon. In the case at bar the statutes of this state require the submission of amendments to the Constitution, creation of new counties, and other similar questions, to the voters on a ballot separate and distinct from the ballot used in voting for various officers, and that it be deposited in a separate box. And it is clear to us that the words 'votes cast' as used in § 168 mean the total of the separate votes of the voters for and against the question submitted. The votes cast for presidential electors have no relation, in the matter of determining who are elected or which party prevails, to the votes cast for governor and *vice versa*. There is no more reason why the votes cast on the question of creating a new county should have any relation to the votes cast for governor than the votes cast for presidential electors should have. Nor is there any logical reason why the votes cast for governor should have any relation to those cast on the question of the creation of a new county." (p. 38.)

"According to the American doctrine the majority is entitled to rule—the preference of a majority on any question is expressed by the vote of those who actually vote, unless a different intention is clearly expressed. The choice of the voter is expressed by the vote he actually casts for or against a proposition. To adopt the relator's theory in this proceeding would be to give as great weight to a vote which was not cast as to one which was cast, and in effect would be to count the electors who voted for governor, and did not vote on the county division question, as voting against the division. It ought to require the plainest language, and that it be so expressed as to leave absolutely no doubt in the mind of the intelligent reader of its meaning to justify

a court in holding that no vote counts precisely the same as though the vote had been cast against the proposition. The correct principle applicable in cases where the meaning is ambiguous, or is not so expressed as to clearly indicate that an elector who does not vote shall be held as voting 'No,' is that electors who do not participate in an election, or are not interested enough in public affairs to attend the polls and cast their vote and express a choice, acquiesce in the result of the votes cast by those who do vote, whatever such result may be. It is equally plain that if an elector enters the booth and votes for some candidates and not for others, or votes for all candidates, but fails to express his choice on a question submitted, he delegates to those who do vote his rights as an elector and acquiesces in the result, be it one way or the other." (p. 39 citing cases.)

These principles of construction announced in this case apply to the case at bar, if that case is an authority, and the doctrine of *stare decisis* obtains unless there can be read into the amendment involved and the surrounding circumstances, outside of the phrase itself, a clearly expressed legislative intention to, obviate such construction.

No process of refinement can make these principles of construction, so clearly announced, as applied to § 168 of the Constitution different when applied to the Gibbens Amendment in question concerning the meaning of the phrase, *"a majority of all legal votes cast."*

The language of the phrase used in both is exactly the same, and the surrounding phraseology, remarkably similar.

Under said § 168 of the Constitution, it is required that the proposition be submitted at a *general* election. Under the Gibbens Amendment, it is likewise required that the proposed initiated amendment be submitted at a *general* election. Relators contend that there is a distinction to be drawn here because in the Gibbens Amendment the phrase used is "a majority of all the legal votes cast at such *general* election," whereas in said § 168 it provides only, "at *such* election" and that the holding of Judge Spalding in the Blaisdell Case in respect thereto, was that the voting on the county division question was, in effect, a separate election and further that the use of this word "general" in connection with the provision in said Gibbens Amendment that the proposed amendment shall be placed upon the ballot to be voted upon by the people at the next general election, manifestly in-

dicated an intention that the proposition should be placed upon the general ballot, or, at least, if placed upon a separate ballot, that it should be considered as a part of the general ballot to all intents and purposes and excluded the idea that a vote on such proposition should be in any manner treated as a special election or as anything except a constituent part of the general election.

Regardless of the violence that this argument to the definitions and principles of construction stated by Judge Spalding, relators' contentions are easily answered. Relators apparently entirely overlooked the case of State ex rel. Miller v. Flaherty, 23 N. D. 313, 41 L.R.A.(N.S.) 132, 136 N. W. 76, as well as the statutory provisions applicable. The Gibbens Amendment is self-executing in its terms. Statutory legislation and expressed legislative policy already existing, not contravening or in opposition to its terms, furnished the law and the intent to carrying into execution its provisions. State ex rel. Twichell v. Hall, post, 459, 171 N. W. 213.

Under § 959, Compiled Laws 1913, proposed constitutional amendments are required to be printed on a separate ballot and to be deposited in a box separate from that provided to receive ballots for public officers.

There was the same statutory provision for a separate ballot and a separate box in which the same were required to be deposited, at the time the question of county division under said § 168 was involved in the Blaisdell Case. The proposed amendments involved herein were printed on a separate ballot and were presumably deposited in a separate box. At the general election in November, 1918, there were four different ballots, the general ballot for congressional, state and county offices, the nonpartisan school ballot for state and county superintendents of schools, and the nonpartisan judiciary ballot for judge of the supreme court. The nonpartisan ballots and the constitutional amendments ballot, each presented a complete separate election simultaneously held with the general election. State ex rel. Miller v. Flaherty, supra.

In this case, concerning this matter, the court said: "As further evidencing the legislative intent, notice also that under our present primary election laws two classes of primary elections are now simultaneously held: Namely, the nonpartisan judiciary primary, a com-

plete separate election at which no test of party fealty can be exacted
and is in express terms prohibited; the object of which act is to nomi-
nate in a nonpartisan manner, regardless of political affiliations, can-
didates to be elected in the fall at a similar nonpartisan election then
held simultaneously with the general election; in addition, simultane-
ously there is held the partisan primary, at which the personnel of two
or more separate party tickets is chosen to contend for office by election
at the ensuing general election upon party platforms.   That such elec-
tions, though held together, are in law separate elections, see State ex
rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360, where it was
held that a change of county boundaries amounting to county division
and the formation of new counties under § 168 of the Constitution,
and therein required to be submitted to the electors and adopted by
them at a general election, was no part of the general election at which
the question was submitted; but, instead, was a special election simul-
taneously held upon that one matter, at which a majority only of the
votes cast thereon (or in said special election) was necessary, and
county division was legally carried when a majority of the votes cast
on the division proposition voted affirmatively thereon, although such
affirmative votes were not in fact a majority of all votes cast at the
general election simultaneously."

Following these decisions, consonant with the legislative expressed
policy concerning our election laws pursued since statehood, there re-
mains no room for argument, therefore, that the submission of a con-
stitutional amendment to the people in this state is an independent
proceeding or submission and that a "vote cast" is the individual ex-
pression of the "voter" upon the particular proposition or upon the
particular office to be filled.   A "vote cast" is not the aggregate ex-
pression of the individual "voter" upon the various propositions or
questions and the various offices to be filled.   "Votes cast" does not
mean the same as "the aggregate number of electors who did vote at
an election."   Both upon reason and principle this construction, accord-
ing to the ideas of American democracy, adopted and consistently fol-
lowed in this state both by legislative expression and judicial con-
struction, should be and is adhered to by this court.

Furthermore, § 1025, Compiled Laws 1913, specifically requires the
State Board of Canvassers to ascertain the whole number of votes

given for and against any proposed constitutional amendment sub-
mitted to a vote of the people and to determine and certify whether
such amendment has been approved and ratified by "a majority of the
electors voting thereon." If this section had required such board to
determine and certify whether such amendment has been ratified and
approved by "a majority of votes cast," it would mean the same as
it now provides. Upon the construction placed as stated herein, the
legislative expression, the judicial construction continuously followed
in this state, and the Gibbens Amendment all agree. But relators
contend that there are peculiar circumstances in connection with, and
in the passage of, the Gibbens Amendment that show peculiarly an
intent for a construction contrary to these established rules and prece-
dents of legislative expression and judicial construction heretofore
obtaining in this state. They mention that the Gibbens Amendment
states two different phrases as a method of determining approval by
the people, one in the first subdivision, the original § 202 of the Con-
stitution before amendment, which requires an approval of a pro-
posed constitutional amendment submitted by the legislative assembly
"by a *majority of the electors qualified to vote for members of the legis-
lative assembly voting thereon* and the other, contained in the Gibbens
Amendment proper, the phrase in question, *"a majority of all legal
votes cast at such general election."* They contend that these two dif-
ferent phrases do not mean the same, and that the fact that a different
phrase was used displays an intent to require a majority of the aggre-
gate number of electors who voted on any question or proposition at a
general election in order to approve or ratify a proposed constitutional
amendment under such Gibbens Amendment. Further, they contend
that said § 1025, Comp. Laws 1913, was enacted years ago for purposes
of submission of constitutional amendments under § 202 of the orig-
inal Constitution. They further state that in the legislative assemblies
of 1911 and 1913 other proposed amendments to the Constitution
were being considered by such assemblies (heretofore mentioned) ; that
these proposed amendments contained phrases concerning the method
of determining the approval of the electors showing clearly a require-
ment of only a majority of votes on the specific proposition submitted ;
that all of these proposed amendments were defeated in the 1913 Legis-
lative assembly excepting the Bessessen Amendment providing for an
initiative and referendum as to legislation (art. 15 of Constitution),

which requires approval of matters submitted thereunder by a majority of the votes cast thereon and not otherwise; that these circumstances show an intent to apply a different meaning to the phrase "a majority of all legal votes cast," contrary to the meaning and construction theretofore given by legislative expression and judicial construction, and therefore the rule of *stare decisis* should not apply, and State v. Blaisdell should be overruled. In the opinion of the court this contention presents the only serious question on the merits raised by the relators. It is answered by a consideration of our various constitutional provisions, and statutory provisions, and expressed legislative policy, even that of the legislative assemblies of 1911 and 1913, concerning the various phrases involved, the general interpretations placed thereon, as well as by settled rules and principles of construction.

Article 10 of the Constitution, concerning county and township organization, was considered and reported to the constitutional convention by the committee on county and township organization. It was considered by the committee of the whole in such convention, section by section. It will be noticed that in this article, in § 168 thereof, the phrase in question, *"a majority of all the legal votes cast"* occurs; in § 171 of the same article, relating to the continuance of township organization for the county, the question of such continuance submitted to the electors depends upon *"a majority of all the votes cast upon such question"* at a general election. Here in the same article the two phrases are used substantially the same as in the Gibbens Amendment. Both of these sections were considered by the constitutional convention: the constitutional debates disclose no intent to impart a different meaning to such phrases. In fact the record of such debates show no question raised concerning the same. Accordingly, the same question, concerning intent, only in a stronger form, was present in the consideration of the case of State ex rel. McCue v. Blaisdell. Judicial construction in this state has said that these phrases mean the same thing. Legislative enactment and expression has likewise construed the same to mean the same. Under § 1007, Compiled Laws 1913, existing as such practically since statehood, inspectors of election are required to determine and certify the number of votes cast for and against each proposition submitted, constitutional amendment, county division matter, or otherwise. Furthermore, in the division of

counties, § 3205, Comp. Laws, 1913, has required for over twenty-four years (Rev. Codes 1895, § 1854) the county commissioners to prepare a form of ballot for voting upon county division pro and con, and for the canvass and return of the votes cast upon the proposition submitted. Likewise, § 3206, Comp. Laws 1913 (being substantially same as § 1855, Rev. Codes 1895), provides, "if it shall appear that a *majority of all votes cast at such election* in each of the counties interested is in favor of the formation of such new county or counties," the county auditor shall so certify to the secretary of state, etc.

The legislative construction so given, not only subsequent, but also anterior and concurrent with, the State ex rel. McCue v. Blaisdell Case, is obvious.

With this construction concerning the phrase *"a majority of all the legal votes cast,"* both legislative and judicial, existing in this state ever since statehood, the Gibbens Amendment was introduced with this specific phrase therein contained and repeated, adding such Gibbens Amendment proper (subdivision 2 of art. 16), merely to the original § 202 of the Constitution. What purpose was intended thereby? Was it the purpose and intent to introduce doubt and uncertainty or was it the purpose to try and make definite and certain the meaning of such phrase? Surely if the purpose was to introduce an uncertainty as to meaning, why should there be used a phrase, practically the identical phrase, which had been passed upon both judicially and in a legislative way ever since statehood. In the Constitution itself, then existing, there was before the legislative assembly many other modes of expression concerning this question of determination of a vote, such as the phrase *"majority of the electors voting at a general election"* contained in § 122, Const., and the phrase *"majority of all the legal voters voting"* contained in § 170, Const., upon which there did not exist such specific legislative and judicial construction. Why were these phrases not used if it should be said that there was any intent to introduce doubt and uncertainty? Every legislator in these legislative assemblies for the years 1911 and 1913 had the right to rely upon the meaning and construction placed upon the phrase "a majority of all the legal votes cast" both by the judiciary and the theretofore legislative expressions and enactments had. Every such legislator had the right to give expression to a different intent by

using a different phrase, or by expressly indicating in a legislative way a different meaning to the specific phrase in question so as to expressly overrule the legislative and judicial construction then obtaining. Such legislative assemblies did not so do. On the contrary they expressly recognized the theretofore interpretation and construction given both in a judicial and legislative way, by the re-enactment of § 1886, Rev. Codes 1895, through chap. 117, Laws 1915. By the re-enactment of chap. 45, Laws 1907, through chap. 77, Laws 1911. Likewise the 1917 legislative assembly again recognized this settled construction by re-enacting chap. 117, Laws 1915, through chap. 102, Laws 1917. Certainly, if it was the intent to make definite and certain a method of determining the approval of the people, and so it is presumed the legislative intent was, a phrase was used which specifically had been determined, both by judicial and legislative construction, concerning its meaning. The fact that other proposed amendments, considered in the same legislative assemblies, used different phrases as a method of determining approval by the people, some specifically mentioning the vote upon the proposition, pro and con; that all of these were finally defeated excepting the Bessesson Amendment (supra) which was adopted and specifically provides for a *"majority of the votes severally cast for and against the proposition"* —does not show a legislative intent to overrule the long-established meaning given to the phrase involved herein. It is not shown nor is it claimed that the passage or defeat of the proposed amendments, so mentioned, or any of them, depended upon these different phrases that were variously used. It is not shown nor is it claimed that the meaning of the phrases so used in such proposed amendments were even debated or considered either in committees or on the floors of the respective legislative assemblies. The Gibbens Amendment was introduced in the senate, in 1911. It was reported out of the committee with only minor amendments. It passed the senate practically unchanged in the form that it was introduced. It passed the house unchanged. Not anywhere in the record of the house or the senate is there shown any action which indicates any attempt to change this phrase or to give to it any different meaning or interpretation than that already had by judicial and legislative construction. If any inference, at all, is to be indulged in, it is that this legislative assembly, having

five other matters concerning proposed constitutional amendments before it, all using various phrases and methods of determination for the approvals thereof by the people, and having thereby this specific matter at least brought to their attention from the contents of the respective proposals, were satisfied with the phrase as used in the Gibbens Amendment and with the meaning and construction that had been theretofore placed upon the same knowledge of which the relators concede the assembly presumably had. In fact, the various proposed amendments before such legislative assembly differed widely in their matters of substance and procedure as an inspection of the same will readily disclose. In 1915 such proposed amendments referred to that legislative assembly had to be adopted, if at all, unchanged. It is fair to presume that some of the wide differences in substance and procedure in these proposals had something to do with the defeat of some of such proposals. It also will be noted that the proposed amendments that were adopted were the senate proposals; also, that the records of the house and senate journals disclose a long consideration and spirited contention concerning whether the senate proposals or house proposals should be adopted. These matters may also have had something to do with the proposals so defeated. Furthermore, it should be taken into consideration that these various proposed amendments were each largely framed upon existing or proposed initiative and referendum measures or amendments in various other states.

The practical construction given by the legislative department upon the phrase in question both in the constitutional and statutory provisions is entitled to be considered by, and to have weight with, the judiciary. 8 Cyc. 736; Cooley, Const. Lim. 7th ed. 102; Sutherland, Stat. Constr. § 229; Story, Const. §§ 408, 409; State ex rel. McCue v. Blaisdell, 18 N. D. 39, 119 N. W. 360, and cases cited; State ex rel. Davis v. Fabrick, 18 N. D. 402, 121 N. W. 65; State ex rel. Linde v. Packard, 35 N. D. 298, 322, L.R.A.1917B, 710, 160 N. W. 150.

"In cases of doubt and uncertainty the solemn declaration of the legislative branch of the government, or practical construction by the executive department, gives a certain sanction, and will be influential with the courts. So the meaning of particular words in a recent statute will have weight, and their meaning may be inferred from earlier statutes in which the same words or language have been used, where the

intent was more obvious or had been judicially established. The words of a statute, if of common use, are to be taken in their natural, plain, obvious, and ordinary signification; but, if a contemporaneous construction by the legislature of the same words can be discovered, it is high evidence of the sense intended." Sutherland, Stat. Constr. § 229.

The judicial construction upon the phrase involved has been in accord with this legislative construction and expression and has been well settled in this state. State ex rel. Larabee v. Barnes, 3 N. D. 319, 55 N. W. 883; State ex rel. Little v. Langlie, 5 N. D. 594, 32 L.R.A. 723, 67 N. W. 958; State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360; State ex rel. Davis v. Fabrick, 18 N. D. 402, 121 N. W. 65; State ex rel. Miller v. Flaherty, 23 N. D. 321, 41 L.R.A. (N.S.) 132, 136 N. W. 76; State ex rel. Minehan v. Thompson, 24 N. D. 273, 314, 139 N. W. 960.

Other courts have recognized the propriety of the rule of construction applied and adopted by the courts of this state upon the particular phrase *"majority of votes cast."* Gillespie v. Palmer, 20 Wis. 544; Sanford v. Prentice, 28 Wis. 358; Marion County v. Winkley, 29 Kan. 36; State ex rel. Crocker v. Echols, 41 Kan. 1, 20 Pac. 523; Territory ex rel. McGuire v. McGuire, 13 Okla. 605, 76 Pac. 165; State ex rel. Durkheimer v. Grace, 20 Or. 154, 25 Pac. 382; Chamlee v. Davis, 115 Ga. 266, 41 S. E. 691.

Contra: Adkins v. Lien, 10 S. D. 437, 73 N. W. 909; but see Williamson v. Aldrick, 21 S. D. 13, 108 N. W. 1063; State ex rel. Pryor v. Axness, 31 S. D. 125, 139 N. W. 791; People ex rel. Reed v. Weber, 222 Ill. 180, 78 N. E. 56; People ex rel. Wheaton v. Wiant, 48 Ill. 264; Stebbins v. Judge of Superior Ct. 108 Mich. 693, 66 N. W. 595; State ex rel. Omaha & S. O. Street R. Co. v. Bechel, 22 Neb. 158, 34 N. W. 342.

The cases cited by the parties hereto upon the rule of construction applied to the phrase, "majority of electors," "majority of voters," and similar phrases are not specifically discussed or quoted for the reason that this court has definitely prescribed a rule of construction concerning the phrase, "majority of legal votes cast," the specific phrase herein involved thereby rendering it unnecessary to consider the rules of construction that other courts have placed, pro or con, upon different phrases than that under consideration.

The above considerations present a clear case for the application of the rule of *stare decisis,* a rule of construction adopted and followed by repeated decisions of this court, sustained by legislative expressions and enactments ever since statehood, upon which personal and property rights in this state for years have been determined and adjudicated.

The application should be denied and the proceedings herein ordered and dismissed.

ROBINSON, J.   This case is brought to review the proceedings of the State Board of Canvassers on five constitutional amendments submitted to the voters by petition under § 202 of the Constitution. Under that section a petition for the submission of the amendments was signed by 50,000 voters, filed in the office of the secretary of state, and duly advertised.   By that section when an amendment "receives a majority of all the votes cast at the general election," it must be .referred to the next legislative assembly; and, if agreed upon by a majority of all the members elected to each house, it becomes a part of the Constitution; if not agreed upon, it does not become a part of the Constitution.   The legislature is given absolute power to act upon and to disapprove an amendment; and the power to approve and disapprove go together—the one implies the other.   The power to disapprove an amendment clearly implies the power to approve it.   Section 202 was formulated by old-time members of the legislative assembly who were opposed to the submission or passage of any amendment by way of a petition and who desired to reserve to themselves full power to approve or disapprove of any amendment that might be referred to them.   Hence it is that by § 202, the fundamental law, the legislative assembly is given full power to approve or disapprove any amendment and its decision is final and conclusive.   Of course it may err. It is not infallible; but that fact in no manner lessens the finality of its decision.

At the general election the total number of voters were 94,055.   The report of the canvassing board erroneously stated that the total number of votes cast were 94,055.   The board erroneously assumed that every person cast but one vote.   The error was grave and misleading and it was based on the assumption that each person does cast but one vote,

whereas, in truth, nearly every person voted four ballots and each ballot gave expression to several votes. Each amendment in question received a large majority of all the votes cast thereon, but did not receive a vote equal to all the votes cast at the election. That was an impossibility, because each person cast several votes and the total number of votes cast were at least three or four times the total number of voters. Surely it was over 300,000 and a majority of the votes cast was over 150,000; it was probably several times that number. And of course no amendment could receive 150,000 votes when the total number of voters was only 94,055.

To vote is to express a preference for any man or any measure in the manner prescribed by law. On every ballot voted by any person each X mark does express a preference for some man or some measure, and the total number of X marks expresses the total number of votes cast by the voter. At the last general election four ballots were voted: (1) A long ballot containing the names of the candidates for state and county offices; (2) a ballot with the names of supreme court candidates; (3) a ballot with the names of candidates for superintendent of public instruction; (4) a ballot containing a copy of ten proposed amendments. If each person casting a ballot had voted for or against the several amendments, that alone would have represented a vote equal to ten times the number of persons voting at the election, to wit, a vote of 940,550. Hence it is manifest there could be no such thing as any amendment receiving a majority of all the votes cast. Therefore, we must conclude that the phrase "a majority of all the votes cast at the general election" means a majority of all the votes cast for or against any measure or amendment, and as each of the five amendments received a large majority of all the votes cast for or against the same, it follows that each of said amendments was properly referred to the legislative assembly for approval or rejection and also that the Canvassing Board did properly certify the amendments in question showing that each amendment received a majority of all the votes cast thereon. It is strenuously contended that according to the true meaning of § 202 each amendment submitted for approval should have an affirmative vote equal to a majority of all persons voting at the election, but there is nothing to warrant such a contention, and it is fair to assume that § 202 was framed by lawmakers who knew how

to use the English language and to express a clear and definite meaning. Hence it is the judgment and determination of the court that the amendments were properly passed and certified to the legislative assembly and that by § 202 its determination is final and conclusive.

CHRISTIANSON, Ch. J. (dissenting). What number of votes is necessary to ratify a constitutional amendment proposed by initiative petition? That is the question which it is sought to have determined in this proceeding.

The methods of amending the Constitution are prescribed by § 202 of the state Constitution. The entire section reads as follows:

"First: Any amendment or amendments to this Constitution may be proposed in either house of the legislative assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment shall be entered on the journal of the house with the yeas and nays taken thereon, and referred to the legislative assembly to be chosen at the next general election, and shall be published, as provided by law, for three months previous to the time of making such choice, and if in the legislative assembly so next chosen as aforesaid such proposed amendment or amendments shall be agreed to by a majority of all members elected to each house, then it shall be the duty of the legislative assembly to submit such proposed amendment or amendments to the people in such manner and at such times as the legislative assembly shall provide; and if the people shall approve and ratify such amendment or amendments *by a majority of the electors* qualified to vote for members of the legislative assembly *voting thereon,* such amendment or amendments shall become a part of the Constitution of this state. If two or more amendments shall be submitted at the same time, they shall be submitted in such manner that the electors shall vote for or against each of such amendments separately.

"Second: Any amendment or amendments to this Constitution may also be proposed by the people by the filing with the secretary of state, at least six months previous to a general election, of an initiative petition containing the signatures of at least twenty-five per cent of the legal voters in each of not less than one half of the counties of the state. When such petition has been properly filed the proposed amend-

ment or amendments shall be published as the legislature may provide, for three months previous to the general election, and shall be placed upon the ballot to be voted upon by the people at the next general election. Should any such amendment or amendments proposed by initiative petition and submitted to the people receive *a majority of all the legal votes cast at such general election,* such amendment or amendments shall be referred to the next legislative assembly and should such proposed amendment or amendments be agreed upon by a majority of all the members elected to each house, such amendment or amendments shall become a part of the Constitution of this state. Should any amendment or amendments proposed by initiative petition and receiving *a majority of all the votes cast at the general election as herein* provided, but failing to receive approval by the following legislative assembly to which it has been referred, such amendment or amendments shall again be submitted to the people at the next general election for their approval or rejection as at the previous general election. Should such amendment or amendments *receive a majority of all the legal votes cast at such succeeding general election* such amendment or amendments at once become a part of the Constitution of this state. Any amendment or amendments proposed by initiative petition and failing of adoption as herein provided shall not be again considered until the expiration of six years."

The first subdivision of the section was embodied in the Constitution adopted in 1889; the second subdivision was adopted as a constitutional amendment in 1914.

It will be noticed that it is provided that an amendment proposed by the legislative assembly (under the first subdivision), shall be approved "by a majority of the electors . . . voting thereon;" and that an amendment proposed by initiative petition (under the second subdivision), shall "receive a majority of all the legal votes cast at such general election,"—i. e., the general election at which the amendment is submitted. The question here is: Do these two phrases mean the same thing? And did those who framed and those who adopted the second subdivision intend to say in the latter phrase the same thing which had been said in the former phrase?

The object of construction, as applied to a written Constitution, is to ascertain and give effect to the intent of its framers, and of the people

in adopting it.   But "the intention to which force is to be given is that which is embodied and expressed in the constitutional provisions themselves.   Words or terms used in a Constitution, being dependent on ratification by the people, must be understood in the sense most obvious to the common understanding at the time of its adoption."   6 R. C. L. p. 52.   "A Constitution is an instrument of government, made and adopted by the people for practical purposes, connected with the common business and wants of human life.   For this reason pre-eminently, every word in it should be expounded in its plain, obvious, and common sense."   People v. New York C. R. Co. 24 N. Y. 485, 486.

As the great jurist, Marshall, said:   The framers of the Constitution, and the people who adopted it, "must be understood to have employed words in their natural sense, and to have intended what they have said."   Gibbons v. Ogden, 9 Wheat. 1, 188, 6 L. ed. 23, 68. The noted Judge Cooley, said:

"Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government." Cooley, Const. Lim. 7th ed. 93.   The people who adopt a constitutional provision doubtless judge "it by the meaning apparent on its face." Smith v. Thursby, 28 Md. 244, 269.   Of course there are certain words which are employed in a technical sense, such for instance as the term "ex post facto laws."   When such words or terms have acquired a well-understood meaning, it must be supposed that the people had such meaning in view in adopting them.   "The technical sense in these cases is the sense popularly understood, because that is the sense fixed upon the words in legal and constitutional history, where they have been employed for the protection of popular rights."   Cooley, Const. Lim. 7th ed. 94.   But the words and terms of a Constitution "are to be interpreted and understood in their most natural and obvious meaning, unless the subject indicates, or the text suggests, that they have been used in a technical sense."   And, "the presumption is in favor of the natural and popular meaning in which the words are usually understood by the people who have adopted them."   12 C. J. 705, 706.

It has been said that "in interpretation the first impression made by

a writing is an important factor, because the writing is then being tested in the same manner that the writer expected and in the same manner that the writer prepared the writing to be received."

It has also been said that "it is generally safe to reject an interpretation that does not naturally suggest itself to the mind of the casual reader, but is rather the result of a laborious effort to extract from a statute a meaning which it does not at first seem to convey." Ardmore Coal Co. v. Bevil, 10 C. C. A. 41, 27 U. S. App. 96, 61 Fed. 757; Schulthis v. MacDougal, 162 Fed. 340.

What is the first impression made by the words, *"a majority of all the legal votes cast at such general election?"* What is naturally suggested to the mind thereby? What did the people of this state understand these words to mean at the time they adopted the amendment containing the phrase? Is there any serious doubt as to how these questions should be answered? I think not. The words are not technical. They are words of common and ordinary use. Their utterance promptly conveyed, and conveys, a certain idea to the popular mind. And there is no room for argument as to the meaning generally attributed to them by the people of this state. It is undeniable that the phrase, "a majority of all the legal votes cast at such general election," was uniformly understood throughout the state to mean a majority of the votes cast by all the legal voters who participated in such general election. No one ever asserted that the phrase had any other meaning until after the election in 1918. During the campaign preceding the election those opposed to, as well as those in favor of, the amendments were of the same mind. For instance, the Republican state central committee (which had indorsed the amendments), issued a pamphlet entitled, "The Truth about the Constitutional Amendments." In this pamphlet (page 15), it is said: "In order to carry, the constitutional amendments *must have a majority of all votes cast,* so that the citizen who does not vote at all on these measures *is helping defeat them as much as the man who votes against them."* Statements to the same effect appeared in the newspapers of the state generally. No one contended that the phrase meant what the majority members now hold that it means. Of course, it is true, this is not evidence of the intention of the framers or proposers of the provision under consideration,

but it tends to show the meaning uniformly attributed thereto by the people of the state.

But let us consider the intention of those who framed and proposed the amendment embodied in the second subdivision of § 202. Let us bear in mind the object of the second subdivision, and the situation which confronted the men who framed it, and the legislators who proposed it. There was then in existence only one method of proposing constitutional amendments, to wit, the method proposed in subdivision 1 of § 202. The second subdivision provides a wholly different method of proposing constitutional amendments. The first subdivision provides for the proposal of constitutional amendments by the legislative assembly; the second subdivision provides for the proposal of such amendments by initiative petition. An amendment proposed under the first subdivision is proposed by the chosen representatives of the people. It must receive the approval of two successive legislative assemblies before being submitted to the people. It is published as a part of the proceedings of both legislative assemblies. It must also be published for three months previous to the election of the members of the second assembly, so that the people may know that the members they are about to choose will be required to vote for or against the submission of the *proposed* amendment. An amendment proposed by this method remains pending for a considerable length of time and much publicity and opportunity for discussion is afforded. But an amendment proposed by initiative petition does not emanate from any representatives chosen by the people, but from those who prepare, circulate, or sign such petition. No publicity is required before the petitions are circulated or filed. The proposed amendment is submitted at the next general election, if the petition is filed with the secretary of state at least six months prior thereto. The differences between the two methods of amending the Constitution are self-evident. These differences were recognized by the men who framed, proposed, and adopted the second subdivision. They established new standards and prescribed a different procedure for amendments proposed under the second subdivision from those established and prescribed in the first subdivision. The first subdivision expressly authorizes the legislature to prescribe the times at, and the manner in, which constitutional

amendments proposed by the legislative assembly shall be submitted. If the legislature desires, it may direct that such amendments shall be submitted at a special election. But the second subdivision expressly provides that amendments proposed thereunder shall be submitted at a general election. The legislature is given unrestricted power to prescribe the notice to be given previous to an election at which an amendment proposed under the first subdivision is submitted to the electors for ratification or rejection (as a matter of fact it prescribed ten days' notice); but it is expressly provided that an amendment proposed under the second subdivision shall be published for three months previous to the general election, at which it is submitted.

At the time the second subdivision of § 202 was framed, there were two prevailing rules in this country as to the number of votes required to ratify a constitutional amendment. That is, also, true to-day. Some of the states require only a majority of the votes cast upon the subject, while others require the votes of a majority of all the electors voting at the election at which the amendment is submitted. Our sister state Minnesota has the latter rule. So have many other states. See 12 C. J. 694. The former rule was embodied in the first subdivision of § 202 of the North Dakota Constitution. If the men who framed, and the legislators who proposed, the second subdivision intended to make the rule announced in the first subdivision applicable to amendments proposed under the second subdivision, there was no difficulty in finding suitable language to express such intent. There was no occasion to search for or invent a phrase. The phrase clearly expressing such intent was right before their eyes. Not only so, but the legislators who proposed subdivision 2, § 202, also proposed the constitutional amendment providing for the initiative and referendum of statutes. See Laws 1911, chap. 93; Laws 1913, chap. 101. And in this latter amendment it was provided in plain and unmistakable terms that statutes submitted to the people for ratification or rejection pursuant to initiative and referendum petitions shall require the approval of only a majority of the votes cast upon the particular subject. If the men who framed and proposed the second subdivision of § 202, meant to say that a constitutional amendment proposed thereunder should require only "a majority of all legal votes cast thereon,"

why did they not say so? They said so in the provision relative to the initiative and referendum of statutes. It had already been said in the first subdivision of § 202. That rule was satisfactory as to amendments proposed under that subdivision. No change was proposed therein. But as to amendments proposed under the second subdivision it was specifically stated that such amendments must "receive a majority of all the legal votes cast at such *general* election. This phrase was used three different times. The words were not used idly. There was a reason for their use. There was, also, a reason for the repeated use of the identical phraseology. A constitutional provision is the most deliberate and solemn of writings in our country. It affects every citizen. It "implies a degree of deliberation and a carefulness of expression proportioned to the importance of the transaction, and the words are presumed to have been used with the greatest possible discrimination." People v. New York C. R. Co. 24 N. Y. 485, 487. "It is not to be supposed that any words (in a constitutional provision) have been employed without occasion, or without intent that they should have effect as part of the law." Cooley, Const. Lim. 91.

But the majority members say that the question involved here has been settled by the former decisions of this court, and that we ought to adhere to such decisions. The cases relied upon are: State ex rel. Larabee v. Barnes, 3 N. D. 319, 55 N. W. 883; State ex rel. Little v. Langlie, 5 N. D. 594, 32 L.R.A. 723, 67 N. W. 958; and State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360. Let us examine these decisions, and see what basis there is for the contention that they are controlling upon the meaning of the phrase involved in this controversy.

State ex rel. Larabee v. Barnes involved an election for the approval or rejection of the proposed Constitution of this state. The election was provided for in the "Enabling Act," under which the states of North Dakota, South Dakota, Montana, and Washington were admitted into the Union. Section 8 of the act provided that the Constitutions proposed by the different constitutional conventions should be submitted to the people of the proposed states for ratification or rejection at an election to be held in each of the proposed states on the first Tuesday in October, 1889. The section further provided: "At the

elections provided for in this section the qualified voters of said pro-
posed states shall vote directly for or against the proposed Constitutions,
and for or against any articles or propositions separately submitted.
. . . And if a majority of the legal votes cast shall be for the Con-
stitution the governor shall certify the result to the President of the
United States, together with a statement of the votes cast thereon and
upon separate articles or propositions, and a copy of the said Consti-
tution, articles, propositions and ordinances." [25 Stat. at L. 679,
chap. 180.] Section 24 of the Enabling Act provided: "That the
constitutional conventions may, by ordinance, provide for the election
of officers for full state governments, including members of the legis-
latures and representatives in the fifty-first Congress; but said state
governments shall remain in abeyance until the states shall be admit-
ted into the Union, respectively as provided in this act."

The constitutional convention provided for the election of state offi-
cers for the proposed state of North Dakota at the same time that the
Constitution was submitted for ratification or rejection. It also pro-
vided that article 20 of the proposed Constitution (relating to the
prohibition of intoxicating liquors), be submitted separately. And
in the schedule or ordinance adopted by the convention, it provided:
"There shall be submitted at the same election at which this Constitu-
tion is submitted for rejection or adoption, article 20, entitled 'Prohi-
bition.' . . . If it shall appear according to the returns herein
provided for that a majority of all the votes cast at said election *for
and against prohibition* are for prohibition, then said article 20 shall
be and form a part of this Constitution and be in full force and effect
as such from the date of the admission of this state into the Union."
The election returns showed that there were 35,548 votes cast for or
against the adoption of the Constitution, and 35,945 votes cast for or
against the adoption of said article 20, of which 18,552 were in the
affirmative and 17,393 in the negative. It will be noticed that a
majority of all the votes for or against said article 20 were in the
affirmative, and also that the affirmative vote for said article 20 ex-
ceeded one half of all the votes cast for or against the adoption of the
Constitution. But there were 38,098 votes cast for governor, and the
affirmative vote upon the adoption of said article 20 was less than one

half of the total vote cast for governor.   Upon these facts it was urged that article 20 had not received the number of votes required under § 8 of the Enabling Act.

It will be noticed that § 8 of the Enabling Act by its express terms was restricted to *"elections provided for in this section."*   The provision relating to the election of state officers was contained in § 24 of the act.   Hence, § 8 by its plain terms did not apply to such latter election. It should also be noted that there was no requirement in the Enabling Act that state officers be elected at the same election at which the Constitution was submitted for approval or rejection.   The time and manner of holding such election was left entirely in the hands of the constitutional convention.   The election provided in § 8 was held pursuant to the act of Congress requiring it to be held at a certain time for a certain specific purpose.   The election for the selection of state officers was held pursuant to the ordinance of the constitutional convention.

State ex rel. Little v. Langlie involved the construction of a statute which provided for an election to relocate county seats.   The statute provided that "if, upon canvassing the votes so given, it shall appear that any one place has two thirds of the votes polled, such place shall be the county seat."   The court in its opinion called attention to the fact that the statute expressly provided that a petition for such election must be "signed by two thirds of the qualified voters of the county," but that in specifying "the vote necessary to relocate the county seat at another place, it studiously avoids the use of this explicit language."   By way of further comment the court said: "To our minds this fact is very significant.   It discloses a purpose to avoid making it necessary that there should be a two-thirds vote of the electors of the county in favor of one place to change the county seat to such place.   The language which is employed makes it apparent that the two thirds vote required is a two-thirds vote on the particular question of the relocation of the county seat.   The statute declares that, in the notice for the next general election, the voters are to be notified to designate upon their ballots the place of their choice.   Then the statute continues, 'And if upon canvassing the votes so given it shall appear

44 N. D.—13.

that any one place has two thirds of the votes polled such place shall be the county seat.' The votes so given are the votes upon this particular question. If, upon the canvass of such votes, without any reference to any other vote at the same general election, it appears that any one place has two thirds of the vote polled, it shall be the county seat. The 'vote polled' is the vote polled upon that question. That is the only matter the statute is dealing with."

State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360, was a county division case. It involved the construction of § 168 of the Constitution, which reads: "All changes in the boundaries of organized counties before taking effect shall be submitted to the electors of the county or counties to be affected thereby at a general election and be adopted by a majority of all the legal votes cast in each county at such election." At the general election in 1908 the question was presented to the electors of Ward county to create the county of Mountrail from a portion thereof. There were 4,207 affirmative and 4,024 negative votes cast upon the proposition. At the same election there were 9,259 votes cast for the various candidates for governor. So the affirmative vote cast for the creation of the new county exceeded one half of all the votes cast upon the proposition, but was less than one half of the votes of all the electors who participated in the election. The court held that § 168 of the Constitution required that a proposition to change the boundaries of an organized county, in order to carry, need receive only a majority of the votes cast thereon, and that therefore Mountrail county had been created.

Two of the points adjudicated in that case, and upon which the construction placed upon § 168 of the Constitution was predicated, are announced in ¶¶ 4 and 5 of the syllabus as follows:

"(4) A majority of the votes cast upon a question submitted to a vote, if in the affirmative, carries it, unless the legislative will to the contrary is clearly expressed in the Constitution or the law.

"(5) In a strict legal sense, although the vote on a change in county boundaries is cast at a general election, it is the holding of a 'separate election,' but held in connection with the general election for convenience, to save expense, and because of the numerous subjects then voted upon, a more complete expression of the preferences of the electors is obtained."

In its opinion (after having announced its conclusion on the points covered by the two paragraphs of the syllabus quoted above), the court said: "It is contended that the words 'at such election' enlarge the application of the words 'votes cast,' and clearly indicate that the highest vote cast on any question at the general election is the criterion by which a majority must be arrived at. But, from the suggestions and reasons we have stated above, and particularly from a consideration of the meaning of the words 'votes cast,' it is clear to us that this contention is erroneous. It certainly *leaves the meaning ambiguous,* and in that event it is conceded that a majority of the votes cast on the question at issue controls." 18 N. D. p. 40.

How can it reasonably be asserted that these three decisions are determinative of the question involved in this case? The provisions involved in State ex rel. Larabee v. Barnes, 3 N. D. 319, 55 N. W. 883, and State ex rel. Little v. Langlie, 5 N. D. 594, 32 L.R.A. 723, 67 N. W. 958, were so entirely different from the provision involved here, that the cases distinguish themselves from the instant case. Some of the reasoning in State ex rel. Little v. Langlie is against rather than in favor of the conclusion reached by the majority members in the instant case. In that case certain language was used in the first part of the section relating to the number of electors who must sign a petition for an election to relocate a county seat. In the latter part of the section other language was used as to the number of votes required at the election. In construing the meaning of the latter language the court called attention to the language contained in the first part of the section, and the failure to use this same language in the latter part thereof. The court said: "It [the statute] carefully excludes the idea that two thirds of the electors must vote for a place to make it the county seat. When speaking of the number of signatures to the petition required, it in terms declares that such petition shall be signed by two thirds of the qualified voters of the county. But when it specifies the vote necessary to relocate the county seat at another place, *it studiously avoids the use of this explicit language which is very appropriate to express the idea that appellant's counsel contends is to be found in the statute.*" This reasoning is directly applicable to the instant case. The first subdivision of § 202 in terms declared that a constitutional

amendment proposed thereunder be approved "by a majority of the electors voting thereon." But with this explicit language before them, the framers and proposers of the second·subdivision "studiously avoided" its use, and in place thereof expressly provided that amendments proposed by initiative petitions must "receive a majority of all the legal votes cast at such general election."

While State ex rel. McCue v. Blaisdell involved a constitutional provision, and the language there construed is more similar to that involved in the instant case than that involved in the other two cases, the language is nevertheless different. In fact the basic reasoning in State ex rel. McCue v. Blaisdell is predicated upon the difference between the language contained in § 168 of the Constitution, and that contained in the second subdivision of § 202. It will be noted that the conclusion in ·State ex rel. McCue v. Blaisdell is predicated upon the premise that the· election to create a new county, although held in connection with. a general election, is nevertheless, a "separate election." Hence, the court said that when § 168 speaks of the "votes cast ⋮ . . ·at such election," it is ambiguous. That is, the words "such election" are capable of being understood in more senses than one,—they may refer to either the general election, or the "separate election" upon the question of county division held in connection with the general election, and that for this reason it will be presumed that they refer to the. separate election.

This reasoning is manifestly not applicable to the case at bar. Here there is no ambiguity. The framers of the provision involved in this controversy eliminated the very ambiguity referred to in State ex rel. McCue v. Blaisdell. They left no room for doubt as to which election they had in mind. ·They specifically provided that a constitutional amendment proposed by initiative petition must "receive a majority of all the legal·votes ·cast at such *general* election." They carefully repeated the term "all the legal votes cast at such *general* election," every time they had occasion to refer to the number of votes required to ratify such proposed amendment. I fail to find any room for application of the doctrine of *stare decisis.* Clearly the phrase involved· in this case is different from that construed in the former decisions.

⋮ It should, also, be remembered that the provision involved in this

controversy relates to the amendment of the fundamental law of the state. This is manifestly the most important political function which the people can perform. In construing the meaning of words and phrases, we should not forget the subject-matter to which they are applied. Lewis's Sutherland, Stat. Constr. § 347. Nor should we forget that "Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." And "it does not follow, either logically or grammatically, that because a word is found in one connection in the Constitution with a definite sense, therefore the same sense is to be adopted in every other connection in which it occurs. This would be to suppose that the framers weighed only the force of single words, as philologists or critics, and not whole clauses and *objects,* as statesmen and practical reasoners." Story, Const. § 454.

In my opinion there is no room for doubt as to what was meant by the phrase, "a majority of all the legal votes cast at such general elections," contained in the second subdivision of § 202 of the Constitution. It meant exactly what the people of this state uniformly understood it to mean prior to the election held in November, 1918. It still means that. For, as Judge Cooley said, "A Constitution is not to be made to mean one thing at one time, and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable. A principal share of the benefit expected from written Constitutions would be lost if the rules they established were so flexible as to bend to circumstances or be modified by public opinion. . . . A court or legislature which should allow a change in public sentiment to influence it in giving to a written Constitution a construction not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath and

public duty; and if its course could become a precedent, these instruments would be of little avail. . . . What a court is to do, therefor, is *to dclare the law as written,* leaving it to the people themselves to make such changes as new circumstances may require." Cooley, Const. Lim. 7th ed. 89.

Certain procedural and jurisdictional questions are discussed in the majority opinions. Inasmuch as my associates have deemed it proper to decide the merits of the controversy I shall not consider or express any opinion upon the other questions considered by them. It is important, however, to note that the opinions of the majority members are all based upon the theory that the State Board of Canvassers was acting under statutory authority in certifying their findings as to the votes cast upon the constitutional amendments involved in this proceeding. For the reasons stated in the opinions which I prepared and filed in State ex rel. Linde v. Hall, 35 N. D. 34, 56, 159 N. W. 281, and in State ex rel. Twichell v. Hall, post, 459, 171 N. W. 213, I was, and still am, of the opinion that there was no law under which such constitutional amendments could be proposed or submitted for ratification or rejection. I am also of the opinion that there was and is no law under which the Board of Canvassers were authorized to make any determination whatever with respect to such amendments. The only provisions relating to the determination and certification of the result of votes cast at any election upon proposed constitutional amendments are §§ 1025 and 1026, Compiled Laws. It is under these sections that the State Board of Canvassers claim authority to act. These sections read: "For the purpose of canvassing and ascertaining the result of the votes taken at any election upon any proposed amendment to the Constitution, or proposition submitted to a vote of the people by the legislative assembly, the State Board of Canvassers shall proceed to examine such statements, and to ascertain and determine the result and shall certify under their hands a statement of the whole number of votes given for and the whole number of votes given against such amendment or proposition, and they shall thereupon determine whether such amendment or proposition has been approved and ratified by a majority of the electors voting thereon, and shall make and subscribe on such statement a certificate of such determination. § 1025.

"The secretary of state shall record in his office such certified statements and determination; and if it shall appear that such amendment or proposition has been approved, ratified, or adopted as aforesaid, he shall also make a record thereof, and cause such record to be found in the volume containing the original enrolled laws passed at the next succeeding session of the legislative assembly, and cause such record to be published with such laws." Comp. Laws 1913, § 1026.

These statutory provisions were enacted in 1892. They were enacted with reference to the then existing method of amending the Constitution—the method provided in subdivision 1 of § 202. They were enacted to provide the necessary machinery to ascertain, record, and proclaim the result of votes cast upon a constitutional amendment proposed by the legislative assembly. An amendment so proposed becomes part of the Constitution if it receives the approval of the electors. If it does not receive such approval it is no longer pending for any purpose. In either event there is nothing for the legislature to do with respect thereto. But an amendment proposed by initiative petition does not become a part of the Constitution by the mere fact that it receives the approval of the electors at the election. If it receives such approval it is referred to the next legislative assembly. It must receive the approval of a majority of all the members elected to each house; and if it fails to secure such approval it is again submitted to the people at the next general election.

Sections 1025, 1026, supra, are applicable to amendments proposed by the legislative assembly, and to such amendments alone. They are not, and never were intended to be, applicable to amendments proposed by initiative petition.